BOUCHER (SIMONTON v.). See Case No. 12,877.

---

## Case No. 1,691.

### BOUCICAULT v. FOX et al.

[5 Blatchf. 87.][1]

Circuit Court, S. D. New York. Oct. Term, 1862.

COURTS—POWER TO GRANT NON-SUIT—COPYRIGHT—INFRINGEMENT—EVIDENCE—ASSIGNMENT AND LICENSE—RIGHTS OF LICENSEE—ABANDONMENT—WHAT MAY BE COPYRIGHTED.

1. A court of the United States is not empowered to grant a non-suit, in a case where evidence has been taken.

2. On the trial of an action for the violation of a copyright of a play, it is not competent, for the purpose of showing that the play was dramatized from a certain book, to prove by a witness a part of the contents of the book, or the identity or resemblance between such part and passages in the play, neither the book nor the play being produced in court, nor any reason for their non-production being shown.

3. Nor is it competent, on the production of the book, to ask a witness to take the book and say whether its scenery, incidents, and language are not substantially the same as those of the play, the play not being produced nor its contents proved.

4. A person who agrees to write a play, to be acted at the theatre of another person, and to act in it himself as long as it will run, and receive a share of the profits as a compensation, does not thereby confer upon any one the legal or equitable title to the play, and is entitled to take out a copyright for it, even after it has been acted at such theatre.

5. Nor does the performance of such play in public, or the performance of it at such theatre, with the consent of its author, for a compensation to him, constitute any evidence of his abandonment of the manuscript to the public or to the profession of players.

[Cited in Boucicault v. Hart, Case No. 1,692; Thomas v. Lennon, 14 Fed. 851; Parton v. Prang, Case No. 10,784.]

6. The rule stated for determining whether a copyrighted work is an original one in the sense of the law.

[7. A dramatic composition is entitled to copyright as original, although a reproduction of old materials in a new form and combination.]

[See Greene v. Bishop, Case No. 5,763; Emerson v. Davies, Id. 4,436; Lawrence v. Dana, Id. 8,136.]

[8. Cited in Boucicault v. Hart, Case No. 1,692, to the point that, irrespective of statute, an author has no exclusive right to multiply copies or control subsequent issues after the first publication of his work.]

[9. Cited in Yuengling v. Schile, 12 Fed. 106, to the point that a copyright may be assigned, to be transferred to a person not entitled, under the act, to take out a copyright.]

At law. This was an action to recover damages for the representation, by the defendants [George L. Fox and James W. Lingard], at the New Bowery Theatre, in the city of New York, of a play called "The Octoroon," in violation of the rights of the plaintiff [Dion Boucicault], as the author and owner of the copyright thereof. The plea was the general issue. At the trial, the plaintiff had a verdict for $500 damages. The defendant now moved for a new trial. [Denied.]

Henry A. Cram, for plaintiff.

James R. Whiting, for defendants.

SHIPMAN, District Judge. The plaintiff, who was an actor, and a dramatic author, made an arrangement with one Stuart, then the lessee of the Winter Garden Theater, in the city of New York, by which the former was to become the stage manager, and general director of the theatre. The particulars of this arrangement are of no importance here, as the undisputed proof in the case is, that it was either never definitely settled, in all its terms, or, if it was, that it was abandoned before the production of the play in question. Under that arrangement, however, such as it was, the plaintiff performed

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

the duties of stage manager, for some weeks, during which the theatre was at first successful, but, the receipts falling off, a new arrangement was made, under which "The Octoroon" was written and brought out by the plaintiff. It appears, incidentally, in the evidence, that Stuart had, some time before, assigned his interest, as lessee of the theatre, to one Fields, in trust for the benefit of certain of his creditors, although he continued to direct its operations, with the approbation, and under the control, of his trustee. The agreement under which "The Octoroon" was produced, was, therefore, made with the assent of this trustee, and the assignment is here mentioned only for the purpose of explaining that fact, as it has no bearing on the merits of the controversy. By one of the terms of this agreement, the plaintiff was to write this play, and he and his wife were to perform in it as long as it would run, at the Winter Garden. He wrote it, and it was brought out about the 6th of December, 1859. The plaintiff and his wife took part in performing it until the 13th of the same month, when they withdrew, and the plaintiff declined to continue his own or his wife's services any longer. The play was, however, kept on the stage, at this theatre, for several weeks after, although the plaintiff's connection with the theatre had ceased on the 13th of December. On the 12th of December, the plaintiff took out a copyright for the play. On the 17th of December he commenced a suit in equity, in this court, to restrain Stuart and Fields from any further representations of the piece. The performance of the play continued at the Winter Garden until Saturday evening, the 21st of January, 1860, when it was withdrawn, and, on the Monday evening following, it was brought out by the defendants at the New Bowery Theatre, where it was performed for nine successive nights. It is for these nine performances, at the latter theatre, that this action was brought.

While the performance of the play was proceeding at the Winter Garden, a negotiation was opened between the defendants, through their treasurer and agent, one Tryon and Stuart, for the purchase of whatever right the latter had in the manuscript, and also for the purchase of the scenery by which the performance was illustrated, which resulted in a verbal agreement between them, by which the defendants were to have all the rights of Stuart to the manuscript, and in its representation, for one hundred dollars. A further sum was agreed on for the scenery. The play was then announced for the New Bowery Theatre, by the defendants, in the following card: "To the public. Messrs. Fox and Lingard beg to inform their patrons and the public, that they have purchased of W. Stuart, Esq., the proprietor of the 'Winter Garden,' the successful drama of the 'Octoroon,' with all the scenery, properties, music, machinery, and everything appertaining to the piece, which will be produced in the &c." During the negotiations between the defendants' agent and Stuart, the latter informed him that his right to the play was in suit, then pending, but the agent insisted that the right to the manuscript, and to the performance of the play, was in Stuart, and concluded the alleged purchase and received from Stuart a copy, the original being still in the hands of the plaintiff. This copy had been taken by Stuart, (whether with or without the consent of the plaintiff does not appear,) before the latter withdrew from the Winter Garden, as Stuart says, "for fear of accidents," and it would seem that it was from this copy, whenever reference to it was needed, that the piece was performed at this theatre after the plaintiff withdrew.

On the trial, the plaintiff proved the performance of the piece at the defendants' theatre for nine nights, from the 23d of January to the 1st of February, inclusive. On this point, there was no opposing proof. The plaintiff also proved, from the record of copyrights, in the possession of the clerk of the district court for the southern district of New York, that he obtained a copyright for the play on the 12th of December, 1859. The records of the suit in equity brought by the plaintiff against Stuart and Fields, was also offered in evidence, for the purpose of fixing the dates of the commencement and termination of that suit, to which the defendants objected. The court admitted the evidence only for the purpose for which it was offered, and the defendants excepted. This exception has not been noticed on this argument, on the ground, no doubt, that the subsequent facts proved by the defendants' witness, Stuart, that such a suit was pending, and that he communicated the fact to the agent of the defendants when he proposed to purchase the play, renders the dates proved from this record clearly relevant. This exception requires, therefore, no further notice.

The plaintiff having rested his case, the defendants moved for a non-suit, on the ground that the declaration did not allege that any copyright of the play had ever been taken out by the plaintiff, and on the further ground that the plaintiff had, by his own showing, by performing the piece for hire, dedicated the right to others, and abandoned his right to play the piece and to a copyright, except as regarded the mere right to print and publish the same. The court overruled this motion, on the ground that the courts of the United States are not empowered to grant non-suits, in cases where evidence has been taken; to which the defendants excepted. This exception, too, has not been mentioned on the argument. The ruling of the court was in conformity to well settled authority and long practice. Doe v. Grymes, 1 Pet. [26 U. S.] 469; D'Wolf v. Rabaud, Id. 476, 497.

The defendants then introduced in evidence, among other things, the agreement between Stuart and the defendants, through their agent, for the purchase of the play, which has already been mentioned. They also proved that bills and advertisements announcing the play, at the New Bowery Theatre, stated that it was to be performed there by permission of Stuart, and that the plaintiff saw some of the bills and posters making this announcement, and did not object to or forbid the performance. The defendants also called as a witness John S. Dasalle, who stated that he was one of the editors of the Sunday Times newspaper; that he had seen the performance of "The Octoroon;" that he knew a novel called "The Quadroon," written and published by Mayne Reid; that it was published before "The Octoroon" was heard of; and that he was familiar with its contents. The defendants' counsel then put the following question to this witness: "Can you state whether the incidents contained in "The Quadroon" are the same as those contained in the drama of "The Octoroon?" This question was objected to, on the ground that the book itself was not produced, and the question was excluded, and an exception was taken. The witness was then asked, if he could state, from recollection, any passages contained in "The Quadroon," which were similar to those in "The Octoroon." This question was objected to, and the court excluded it, to which the defendants excepted. The defendants then offered to prove, by the statements of the witness, that the play was dramatized from the book and was not an original play. This evidence, in this form, was objected to and excluded. Finally, the defendants produced the book, and asked the witness to take it and say whether the scenery, incidents, and language were not substantially the same as those of the play. This question, also, was excluded. As these rulings were excepted to, and have been referred to on the argument, we will notice them here. Of all except the last, it needs only to be said, that neither the book nor the play had been produced in court. The book was in print, and could easily have been obtained. To undertake to prove a part of its contents, or to ask the witness whether such part was identical with, or resembled passages in, the play, was wholly inadmissible, under any known rule of evidence. Whenever matter which is in print or in writing is presented to a court or a jury, for the purposes of construction, or to establish proof of identity, resemblance, or dissimilarity, the documents themselves must be presented for the inspection of the triers, or, on proper reason for their non-production being shown, their contents must be proved. The rule is trite, familiar, and imperative. Nor was the difficulty removed by producing the book, prior to the last question put to the witness. The witness was asked to take the book and say whether the scenery, incidents and language were not substantially the same as those of the play. The play had not been produced, nor had its contents been proved; nor was the witness called upon to give any passage from it, for comparison with any part of the book. To take the opinion of the witness, under these circumstances, would be to substitute his judgment for that of the triers, and that, too, in the absence of the evidence upon which his judgment was founded. The rulings of the court, excluding these questions, were, therefore, correct.

At the close of the evidence, the defendants requested the court to charge the jury as follows: 1. That the employment of the plaintiff by Stuart, to write the play, and its production and performance by the plaintiff, for hire, was a dedication to the profession of players, of the right to play the piece. 2. That the writing the play for hire and compensation paid to the author and its delivery to Stuart, gave not only the title to the play, but a right to its use, as a literary composition. 3. That the voluntary public performance of the play, for hire, is such a publication as to amount to a dedication of the play to the use of the public. 4. That it was the duty of the plaintiff, under the circumstances of this case, to have given notice of his dissent to its performance by the defendants, and his failure to do so estops him from alleging a want of assent. This last request was subsequently modified, and the court was asked to charge, that if the jury were satisfied that the plaintiff daily, or, during the time, frequently, saw one of the defendants at the place at which the piece was being performed, and saw the announcement of it, and knew that it was being played there, it was, as matter of law, his duty to express his dissent from the playing; otherwise, the jury have the right, if they think proper, to draw the inference that it was with his assent. The court refused to charge according to the several requests of the defendants, to which refusal they excepted. They also excepted to the charge in the following particulars: 1. That the piece was an original play, and that the plaintiff was the author and entitled to a copyright. 2. That the plaintiff was entitled to the literary property in the play. 3. That the neglect to dissent did not constitute assent. 4. That there was no evidence of the abandonment of the play by the plaintiff. 5. That Stuart had no right that he could sell to the defendants in this suit. The charge of the court will sufficiently appear, as we proceed to examine the following propositions, which condense the points presented in this controversy. The last of these propositions is not strictly in the case, but, by a liberal arrangement of counsel. it is submitted for our examination. These points are: 1. Was this, on the undisputed evidence in the case, an original play, and the production of the plaintiff? 2. Was the literary property in the

composition, and the exclusive right to its representation, in the plaintiff? 3. Is there any evidence that he had abandoned to the public any of his rights? 4. Is there any evidence except that which was submitted to the jury, that he assented to the performance of the play by the defendants? 5. By a careful comparison of the book called "The Quadroon" with this play, is there any evidence disclosed of a want of originality in the latter, which would be sufficient to support a verdict for the defendants, founded upon that evidence?

The first point we have to consider relates to the authorship of the play. On this, the evidence of Stuart, the defendants' witness is clear and decisive, at least sufficiently so to establish a prima facie case, both as to authorship and originality. He states, that the play was written by the plaintiff, under the special arrangement already referred to. It was to be a new play, and, as such, was put on the stage and had a successful run. Its originality does not appear to have been doubted by Stuart, who was familiar with the current dramatic literature of the day. It was virtually conceded, on the trial, that the plaintiff constructed and wrote the play, although it was insisted that he drew his materials from "The Quadroon," to such an extent, and with so little modification, as to destroy his claim to originality. But the evidence offered in support of this latter claim, was, we think, properly ruled out, for the reasons already given. A clear prima facie case on this point having been made out, and nothing having been shown to rebut it, there would have been no error if the charge had assumed the fact as proved. This, however, was not the precise form of the charge. The language used was, that "if it was the original production of the plaintiff, the title was in him." But it is unnecessary to discuss this point at any length. A verdict for the defendants, resting on this feature of the case and on the evidence as it stood, could not be sustained. It would be clearly a verdict against evidence. The question whether or not, in point of fact, the use made of the materials of "The Quadroon," in the construction of the piece, was such as to deny to the latter the claim of originality, will be hereafter considered.

Our next enquiry is—Was the literary property in the composition, and the exclusive right to its representation, in the plaintiff? The questions, under this head, relate to the bearing, on the plaintiff's title, of the fact, that he wrote the drama while in the employ of Stuart and for hire, and also to the proof of his copyright. It is proper here to revert to the agreement under which this play was produced by the author. That agreement was, that he should write this play and, perhaps, some other plays, and that he should contribute his and his wife's services at the Winter Garden Theatre, as long as the plays

would run there, and receive half the profits, as a compensation. This cannot be construed into a contract, conferring upon Stuart, or any one else, the legal or equitable title to this drama. The title to literary property is in the author whose intellect has given birth to the thoughts and wrought them into the composition, unless he has transferred that title, by contract, to another. In the present case, no such contract is proved. The most that could possibly be said, in regard to the right of Stuart, or his trustee, in the play, is, that the arrangement entitled them to have it performed at the Winter Garden as long as it would run. There is not the slightest foundation upon which they, or either of them, can rest a claim to the literary property in the manuscript. That property was in the plaintiff, subject, at most, to a license or privilege, in favor of Stuart and Fields, to have the piece performed at the Winter Garden. Whether the plaintiff was guilty of a breach of that part of his agreement which bound him to bestow his own and his wife's services, we need not enquire here. Such a breach, if proved, would not vest the proprietors of the theatre with the title to "The Octoroon." A man's intellectual productions are peculiarly his own, and, although they may have been brought forth by the author while in the general employment of another, yet he will not be deemed to have parted with his right and transferred it to his employer, unless a valid agreement to that effect is adduced. Publishers, when they employ authors in particular literary enterprises, of course settle, in the terms of their contracts, the rights of each party and the ownership of the copyright. This was not the case of writing a book for publication and general circulation. The play was to be produced, so far as Stuart and Fields were concerned, for a special purpose, and their rights are co-extensive only with that special purpose, which was, that the play should be brought out by the plaintiff at the Winter Garden, and be performed as long as it would run. The contract cannot, by the most liberal construction, be expanded beyond this. Under these circumstances, the plaintiff was entitled to the copyright which he obtained. The proof of the obtaining of such copyright made a clear prima facie case, and no countervailing evidence was offered. The evidence in the present case is the same as in the case of Roberts v. Myers [Case No. 11,906].

We come now to the third proposition—Is there any evidence, in the case, that the plaintiff had abandoned his rights to the public? It appears, in the proof, that the play was performed at the Winter Garden, under the agreement, and, of course, with the consent of the plaintiff, for some six nights before the copyright was taken out. This is all the evidence there is of an abandonment to the public. From this the defendants argue, that such a public representation for

profit, prior to the taking out of a copyright, was a dedication, to the public, or, at least, to the theatrical public, including the profession of players, of the right to represent the play on the stage. No printed copy of the play having ever been circulated, it is not seriously contended that the plaintiff deprived himself of the right to print and publish it. This, naturally, brings us to an examination of the statute upon which the plaintiff rests for protection, and upon which his suit is founded. It is the act of August 18th, 1856 (11 Stat. 138), and provides, that "any copyright hereafter granted under the laws of the United States, to the author of any dramatic composition, designed or suited for public representation, shall be deemed and taken to confer upon the said author or proprietor, his heirs, or assigns, along with the sole right to print and publish the said composition, the sole right also to act, perform, or represent the same, or cause it to be acted, performed, or represented, on any stage or public place, during the whole period for which the copyright is obtained." The object of this statute is apparent, at a glance. It is to secure to the author of a copyrighted play the sole right to its performance in any public place, after it is printed. While it is in manuscript he needs no protection. Manuscripts are protected by the common law, as well as by the 9th section of the act of February 3d, 1831, (4 Stat. 438); Wheaton v. Peters, 8 Pet. [33 U. S.] 591, 657; Jones v. Thorne, 1 N. Y. Leg. Obs. 408; Bartlett v. Crittenden [Cases Nos. 1,076, 1,082]. Whether a copyright had been taken out by the plaintiff or not, the defendants would have had no right to the use of his manuscript play; and, although they had obtained a copy without the consent of the plaintiff, a court of equity would have promptly restrained them from any use of such copy, beyond what the plaintiff had authorized. The reading of a manuscript lecture or discourse, or the performance of a manuscript play in public, by the author, does not confer upon the hearer any title to the manuscript, or any right to a copy, or to the unauthorized use of a copy, which may surreptitiously, or accidentally, pass into his hands. The jurisdiction of the courts of the United States is, indeed, confined, by the 9th section of the act of February 3d, 1831 [4 Stat. 438], to cases of threatened or actual printing and publication, and would probably not include the public performance of a manuscript play, unless, indeed, the parties should be citizens of different states. But the jurisdiction of the state courts, in suits to protect the owners of manuscripts, is complete, in all other emergencies. The plaintiff, then, being the original author of this play, his performance of it in public, or the performance of it by the company at the Winter Garden, with his consent, for a compensation to him, cannot be regarded as any evidence of his abandonment of the manuscript to the public or to the profession of players. The copy taken by Stuart, whether with or without the consent of the author, was evidently intended by the latter for no other use than that connected with its performance at the Winter Garden, and Stuart had no right to put it to any other use, and could confer none upon the defendants. The common law protected this play, so long as it was in manuscript, or, at least, it was protected by equitable remedies. Macklin v. Richardson, 2 Amb. 694; Curt. Copyr. 103. The act of February 3d, 1831 [4 Stat. 436, c. 16], protects the right of the author to print and publish it. The act of August 18th, 1856 [11 Stat. 138, c. 169], superadds to the rights of the author, the exclusive right to the public representation of the play, after the copyright for printing and publishing it has been granted. The only effect of this act on the rights of the author, while his production is in manuscript, is, that it gives him a remedy at law against a party, after he has taken out his copyright, when, before, he possibly had only a remedy in equity. There can be no evidence of abandonment to the public or any rights growing out of the authorship of a manuscript, drawn from the mere fact that the manuscript has, by the consent and procurement of the author, been read in public by him, or another, or recited, or represented, by the elaborate performances and showy decorations of the stage. If the reading, recitation, or performance is conducted by his direction, by his agents, for his benefit and profit, with the sanction of the law, how can it be said to be evidence of his intention to abandon his production to the public? Suppose Mrs. Kemble were to read, in her unrivalled manner, a drama of her own production, would the reading be a dedication to the public, and authorize any elocutionist to read it, who could obtain a copy, against the consent of the author? How would it change the matter, if she should, instead of reading the play, have it brought out by a company at Wallack's, or the Winter Garden, with all the embellishments which the stage can lend? The true doctrine is, that the literary property in the manuscript continues in the author, so long as he exercises control over it, or has the right to control it; and, until its publication, no one has a right to its use or that of its contents, without his consent. Therefore, any special use of it by him, in public, for his own benefit, is a use perfectly consistent with his exclusive right to its control, and is no evidence of abandonment. Roberts v. Myers [Case No. 11,906].

As to the fourth proposition, very little need be said. It appeared in proof, that the plaintiff several times passed the theatre of the defendants during the time the play was in progress there, and that it was announced by large bill posters, which he must have seen. Indeed, it is conceded, that while the piece was being played there, the

plaintiff knew it, and did not object, during the nine nights in question. The court was asked to charge the jury, that, as matter of law, he ought to have objected, and that his failure to do so would warrant the jury in inferring his assent to the performance. If the defendants had been ignorant of the plaintiff's right, and had gone on under a misapprehension of the facts, or if they had supposed he assented, they might make this claim with a better grace. But the evidence shows conclusively, that Stuart distinctly informed the defendants' agent, when he went to purchase the play, that his. Stuart's right to it was disputed by the plaintiff, in a suit then pending. It shows further, that, instead of relying on the consent of the plaintiff, they impliedly disclaimed it, by publicly announcing, in their cards and bill posters, that the piece was purchased exclusively from Stuart, and was played with his consent. The plaintiff would be entitled to have a verdict against him on the ground of his assent, if one had been rendered against him on the evidence in this case, promptly set aside. The defendants knew, before their purchase, that the plaintiff was contesting, in a court of equity, Stuart's right to the play, even his right to perform it at the Winter Garden, and, when they purchased it from him with this knowledge, they took, with it, the most solemn form of dissent known to the law, and a notice that, if they played the piece, relying on Stuart's conveyance, it was at their own peril. But the jury were not directed on this point of assent, although it is conceived they might properly have been, on the ground that the proof of dissent was clear. They were instructed, that if the plaintiff assented to the performance by the defendants, then he could not recover; and that, in determining whether he did thus assent or not, they could take into consideration his silence when the piece was being performed at the New Bowery Theatre, in connection with the other evidence. There was no error on this point.

We come now to the last topic in this controversy, which relates to the originality of this drama, when compared with the novel of Mayne Reid, called "The Quadroon." Though, as already remarked, not strictly in the record, yet the question is one little fitted for investigation by a jury, and, for reasons already given, was not submitted to them. The counsel, however, have consented that the court may compare the two works, and, if the play cannot be sustained as an original production, then the verdict is to be set aside and a new trial is to be granted.

It is difficult to lay down any precise rule which can be applied in all cases, as a test of originality. A work may be original in the eye of the law, when it is not in the eye of the critic. Mr. Curtis, in his instructive work on Copyright, well remarks: "A book may also be original, in the sense of the law, although the materials of which it is composed, the hints and sources from which its matter was derived, can all be traced out in former works, provided the author has exercised selection, arrangement, and combination, and has thereby produced anything new." Curt. Copyr. 177. These are just reflections, and a rule fully as liberal as that stated by the writer, must be applied to dramatic compositions, where the materials on which the author works are often old and well known. Many of the plays of Shakspeare are framed out of materials which existed long before his time, and were gathered by him from ancient chronicles, and other dusty receptacles of antiquated literature. But these dry bones of the past the poet combined anew, pouring over them the effulgence of his own genius, until they were quickened with a new life and adorned with a hitherto unknown beauty. Of this, Macbeth is an instance. The original tale, from Hollingshed, whether a fable or a verity, was of very indifferent quality; but Shakspeare, as remarked by Sir Walter Scott, "adorned it with a lustre similar to that with which a level beam of the sun often invests some fragment of glass, which, though shining at a distance with the lustre of a diamond, is, by a near investigation, discovered to be of no worth or estimation."

A thorough comparison of the novel and the play in this case, will clearly show that the latter is an original work, in the sense of the law. It is not a copy of "The Quadroon," nor an abridgement of it. The most that can be said in favor of their similarity is, that the dramatis personae of the play are, a portion of them, at least, suggested by those that figure in the novel. The prominent characters in each have some features in common, and move in and are acted upon by the same social organization; but there are points of marked contrast, both in the fictitious persons sketched, and the vicissitudes they experience. Some of the actors in the drama, are almost wholly dissimilar to their supposed prototypes in the novel; and, were it not for their relation to the central figure, which is a quadroon girl in both the book and the play, their resemblance would hardly have been noticed. The author of "The Quadroon" has no just cause of complaint against this plaintiff. His vested rights have not been invaded by the latter, and the policy of the law is to encourage literary labor, so far as it can be done without infringing upon the rights already granted to others. Plagiarism and servile imitations are not to be encouraged. Those literary thefts which are committed upon copyrighted works the law promptly suppresses. The mere copyist, or the slavish imitator who reproduces old materials, substantially in their old form, without new combination, is entitled to no protection under the statute. But the law rests upon no code of comparative criticism. It protects

alike the humblest efforts at instruction or amusement, the dull productions of plodding mediocrity, and the most original and imposing displays of intellectual power. This law should be liberally construed in favor of authors, and, leaving their comparative merits to be settled by critics, at the tribunal of public opinion, it should protect and encourage their labors. The fruits of their literary toils should be secured to them by the highest title, for they keep open the springs of thought which feed the intellectual life of the nation.

We are of the opinion that there is no error in the record, and that the validity of the copyright is fully supported by the originality of the play. A new trial is denied.