[Civil No. 238.   Filed February 13, 1889.]

[21 Pac. 332.]

## T. J. BRYAN, Plaintiff and Appellant, v. D. H. PINNEY, Defendant and Appellee.

1. PRACTICE—INVOLUNTARY NONSUIT—REV. STATS. ARIZ. 1887, PAR. 764 —COMP. LAWS 1877, SEC. 2586, CITED.—Under paragraph 764, Rev. Stats. Ariz. 1887, providing that "At any time before the jury has retired, the plaintiff may take a nonsuit, but he shall not thereby prejudice the right of an adverse party to be heard on his own claim for affirmative relief," an involuntary nonsuit cannot be granted.

2. UNITED STATES SUPREME COURT DECISIONS BINDING.—The supreme court of this territory is bound by the decisions of the supreme court of the United States, which has appellate jurisdiction over the courts of this territory.

WRIGHT, C. J., dissenting.

APPEAL from a judgment of the District Court of the Second Judicial District in and for the County of Maricopa. William W. Porter, Judge. Reversed.

Cameron H. King, Goodrich, Smith, Street & Goodrich, and E. J. Edwards, for Appellant.

Baker & Campbell, for Appellee.

PORTER, J.—The only question necessary to be determined in this case is whether in this territory an involuntary nonsuit can be granted. By the late Compiled Laws (sec.

2586) a nonsuit was granted (1) "by the plaintiff himself at any time before trial, on the payment of costs; . . .(5) by the court upon motion of the defendant, when upon trial the plaintiff fails to prove a sufficient case for the jury." The Revised Statutes (sec. 764) provides: "At any time before the jury have retired the plaintiff may take a nonsuit, but he shall not thereby prejudice the right of an adverse party to be heard on his own claim for affirmative relief." The legislature, having acted on the same question, leaves out clause 5 of nonsuit of Compiled Laws. Can anything be plainer than a denial of an involuntary nonsuit, except wherein affirmative relief was asked by defendant? The mode is pointed out, and we cannot get around it. Had there been no legislation on the subject, we would be bound by the decisions of the supreme court of the United States, which has appellate jurisdiction over the courts of the territory. In *Castle* v. *Bullard,* 23 How. 172, the court says: "Circuit courts have no power to grant a peremptory nonsuit against the will of the plaintiff. It was expressly so held by this court in *Elmore* v. *Grymes,* 1 Pet. 471, and the same rule was also affirmed in *D'Wolf* v. *Rabaud,* 1 Pet. 497. In the case last named the defendants at the trial, after the evidence for the plaintiff was closed, moved the court for a nonsuit, which was denied, and the defendant excepted, and sued out a writ of error; but this court held that the refusal to grant the motion constituted no ground for the reversal of the judgment; remarking, at the same time, that a nonsuit cannot be ordered in any case without the consent and acquiescence of the plaintiff." And in *Crane* v. *Lessees of Morris,* 6 Pet. 609, on same question of nonsuit, say "that this point was no longer open for controversy." See, also, *Silsby* v. *Foote,* 14 How. 222. It is well to say that on the trial in the court below, while objection was made that the nonsuit was improperly granted, the attention of the court was not directed to the existing statutes on the subject, nor were the decisions of the United States supreme court presented.

The judgment of the court allowing the nonsuit is reversed.

BARNES, J.—I concur with Judge Porter. While the granting of an involuntary nonsuit may not always be such

an error as should cause a reversal, yet in a case of doubt it should. Defendant has a right to such a judgment as shall bar him, unless plaintiff escape by a voluntary nonsuit. While there is a conflict of authority on this question, we prefer to follow the practice approved by the supreme court of the United States, which has appellate jurisdiction over the courts of territories, that involuntary nonsuits be not allowed. *Elmore* v. *Grymes,* 1 Pet. 469; *D'Wolf* v. *Rabaud,* 1 Pet. 476; *Crane* v. *Lessees of Morris,* 6 Pet. 598; *Castle* v. *Bullard,* 23 How. 172; *Boucicault* v. *Fox,* 5 Blatchf. 87, Fed. Cas. No. 1691; *Silsby* v. *Foote,* 14 How. 218. This rule also prevails in England, and in many of the states. 2 Tidd's Practice, 869; *Dewar* v. *Purday,* 4 Nev. & M. 633; *Newmarch* v. *Clay,* 14 East, 239; *Watkins* v. *Towers,* 2 Term R. 275; *Elworthy* v. *Bird,* 13 Price, 222; *Dickey* v. *Johnson,* 13 Ired. (35 N. C.) 450; *Scruggs* v. *Brackin,* 4 Yerg. 528; *Hunt* v. *Stewart,* 7 Ala. 525; *Martin* v. *Webb,* 5 Ark. 72, 39 Am. Dec. 363; *Hill* v. *Rucker,* 14 Ark. 706; *Insurance Co.* v. *Soulard,* 8 Mo. 665; *Wells* v. *Gaty,* 8 Mo. 681; *Case* v. *Hannahs,* 2 Kan. 490; *Williams* v. *Port,* 9 Ind. 551; *French* v. *Smith,* 4 Vt. 363, 24 Am. Dec. 616; *Cahill* v. *Kalamazoo Co.,* 2 Doug. (Mich.) 124, 43 Am. Dec. 457; *Lyon* v. *Daniels,* 14 Pa. St. 197; *Railroad Co.* v. *Button Co.,* 24 Conn. 468; *Davis* v. *Davis,* 7 Har. & J. 36; *Amos* v. *Sinnott,* 4 Scam. 447; *Deshler* v. *Beers,* 32 Ill. 369, 83 Am. Dec. 274. And the weight of authority seems to sustain this view.

WRIGHT, C. J., dissenting.—I cannot concur in the views of my associates in this case. The court in its opinion only passes upon the question of involuntary nonsuit. In this dissenting opinion, however, I have deemed it appropriate to consider the other important questions in the case, viz., the propriety of the court's action below in allowing defendant to read the balance of the probate record of the administration of the estate of J. M. Bryan, deceased, without going into the evidence in chief. It is to be observed in the outset that in neither of the three bills of exceptions preserved was there a single exception saved as to the rulings of the court upon the papers, deeds, etc., offered by plaintiff for the sole purpose, as expressed at the time, of deraigning title to a common

source.   This the plaintiff had the undoubted right to do,
under chapter 1, section 3144, Revised Statutes, concerning
the "Trial of the Rights of Property." Indeed, no objection
seems to have been made by the defendants, and therefore no
right of plaintiff under said paragraph was thus far infringed
upon.   Without objection or exception, plaintiff was allowed
to prove a common source of title emanating from one Che-
nowth and wife; the first link in plaintiff's chain of title being
the deed from Mrs. Vina Brown (formerly Bryan), widow
and heir of J. M. Bryan, deceased, and the last link being
the deed from said Chenowth and wife to said J. M.
Bryan, deceased.   Now, all there is of said section 3144
is that, after plaintiff has thus deraigned title to a com-
mon source, the papers, etc., by which the deraignment
is made, are not evidence of title in the defendant, un-
less offered in evidence by him, in which event the plaintiff
is not to be debarred the right to make any legal objections
to the same.   The defendants, however, offered no evidence
of title, and therefore plaintiff's rights under the latter part
of said paragraph were unaffected; so that the right of the
plaintiff to offer the said papers for the purpose of the de-
raignment only was certainly not denied him.   But plaintiff
having in his amended complaint alleged the fact, and then
proven it by the said Vina Brown, that said J. M. Bryan died
intestate in August, 1883; that he had property, etc., and
that she was his widow and sole surviving heir, it was a most
natural and reasonable inquiry that seemed to suggest itself
to the mind of the trial judge, what is the *status* of that estate?
Has there been an administration?   Were there any debts?
If so, have they been paid?   Has the administrator rendered
his final account?   Has there been a final decree of distribu-
tion?   And has the administrator been finally discharged?
We can well suppose that such queries most naturally sug-
gested themselves, especially in view of paragraph 1463, sec-
tion 1, chapter 26, Compiled Laws 1877, then in force.   That
paragraph reads: "When any person shall die seised of any
lands, tenements, or hereditaments, or of any right thereto, or
entitled to any interest therein, in fee-simple, or for the life
of another, not having lawfully devised the same, they shall
descend, subject to his debts," etc.   These considerations be-

came the more forcible, doubtless, when it was recalled that
section 194, paragraph 1711, chapter 29, of said laws, required
the administrator to take possession of all the real estate, as
well as the personal, of the deceased.   That paragraph further
provides that, ''for the purpose of bringing suits to quiet title,
or for partition of such estate, the possession of the executors
or administrators shall be deemed the possession of the heirs
or devisees.   Such possession by the heirs or devisees shall be
subject, however, to the possession of the executor or admin-
istrator, for all other purposes.''   One of the most important
of ''the other purposes'' is to pay the debts of the deceased.
Well, after deraigning title to a common source, this difficulty
occurred; and, to obviate it, plaintiff offered in evidence a
portion only of the probate court record of this administra-
tion, viz., the order granting letters of administration, and
that the administration had been closed, and the administra-
tor discharged.   Here the defendants seem to have interposed
their first real objection; they insisting that, in justice to
them, plaintiff should be required to produce the whole pro-
bate record of said administration.   To this view the court
yielded assent, and so ruled, to which ruling of the court the
plaintiff excepted; and this brings up for consideration the
first real question in this case.   It must be borne in mind that,
upon the refusal of plaintiff to introduce the whole record,
the court permitted defendant to read the balance of it, with-
out going into their own evidence.   Was this error?   We are
clearly of the opinion that it was not.   The rule is an old and
well-established one that, where the plaintiff introduces a
portion of a record, the defendant, on demand and for pur-
poses of explanation, is entitled to have read all the remaining
portions thereof that are pertinent, at least, immediately and
before the intervention of other evidence, and *vice versa*, in
order that the court can consider and properly construe the
whole record.   The reason of the rule is apparent.   The por-
tions not read may, and often do, elucidate the portions read.
Mr. Greenleaf, in his treatise on Evidence (vol. 1, 14th ed.,
sec. 511), quotes from Chief Baron Comyns, in which, con-
cerning this rule, he says: ''The whole record which concerns
the matter in question ought to be produced.''   Phillips on
Evidence (vol. 2) lays down the same rule.   And in the

supreme court of the United States, in *Greenleaf's Lessee* v. *Birth*, 5 Pet. 132, Mr. Justice Story distinctly recognizes the rule, and says: "We must take these proceedings, if at all, [referring to certain proceedings in bankruptcy,] together. . . . It is not competent for a party to insist upon the effect of one part of the papers constituting his own evidence, without giving the other party the benefit of the other facts contained in the same papers." Nor have the state supreme courts varied from this rule. In *Hargis* v. *Morse*, 7 Kan. 415, Mr. Justice Brewer says: "A party may not introduce part of a record, and, relying on presumptions, withhold the remainder." And in *Ogden* v. *Walters*, 12 Kan. 284, the supreme court of that state reiterates the doctrine, and says: "As a general rule, where a party relies upon a record as proof, he must introduce the whole of it; and, if he does not do so, the presumptions from silence or absence will be against him, and not in his favor." And in *Towne* v. *Milner*, Chief Justice Horton, of that state, enunciates the same doctrine. See 31 Kan. 207, 1 Pac. 613. In *Thayer* v. *McGee*, 20 Mich. 195, Mr. Justice Christiancy said: "The plaintiff having himself introduced the enrollment of the decree and proceedings, which, by the statute, constituted collectively the record of the chancery cause, and the plaintiff having read a portion of the papers constituting that record, the whole was in evidence, and the defendants had the right to read any other portion. . . . The defendants had a right to use any such evidence for the purpose of explaining or construing the decree." And in *Platt* v. *Stewart*, 10 Mich. 260, the same distinguished jurist said: "The defendants claimed through the proceedings, and it was for them to put in evidence, if not absolutely every paper in the enrolled record, at least all which had any bearing upon the question whether the proceedings, as a whole, had divested the title of Whitehouse; for the question was not simply upon the independent effect of each separate paper constituting the record, but upon the joint effect of all taken together. The effect of one paper, or part of the record, might modify that of another. The defendants could not select such as might operate in their favor, and throw upon the plaintiff the proof of those parts which might operate against them. The latter, as well as the former,

must be treated as a necessary part of the defendant's evidence." *Mutatis mutandis,* one might suppose he was speaking of the case at the bar. See, also, *Lee* v. *Lee,* 21 Mo. 531, 64 Am. Dec. 247, and *Spanagel* v. *Dellinger,* 38 Cal. 278.

Hence we are unable to see that the court below committed any error in allowing the defendants, upon refusal of the plaintiff to do so, to read the balance of the probate record, without going into their own evidence. The action of the court involved a question which, we think, is a good example, and well illustrates the rule we have just been considering. The portions of the probate record read by the plaintiff showed that there had been an administration of the estate of J. M. Bryan, deceased, and that that administration had been closed; but, while that was true, the balance of the record showed that there were still about eleven thousand dollars of the debts allowed against the estate remaining unpaid. This being true, was not and is not the property conveyed by the widow and heir of J. M. Bryan, deceased, to the plaintiff herein, subject to the payment of these debts? Are not the rights of the creditors represented by these debts paramount to the rights of the heir or her vendee? Did not this property descend to the heir, subject to the payment of the debts of the intestate? In law, was not this a condition precedent to the inheritance? It will not do to say the heir or her grantee can maintain this action, forsooth, because at the time the suit was instituted, although there was a large amount of unpaid debts owing by the estate, there was no acting administrator; for any one of the creditors could have letters of administration taken out anew, and thereby defeat the action, their rights being paramount to those of the heir or her grantee; and therefore such administration would take precedence, entitling the administrator to the possession of the realty belonging to the estate. The true theory on this subject, we think, is, as was said by the United States supreme court in *Meeks* v. *Olpherts,* that no right of action exists in the heir until the order of distribution. See 100 U. S. 564. It may be answered, there could be or need be no order of distribution, unless there was something to distribute, but, in that event, how could there be any estate to sue for? Of course, there might be instances of inattention and inexcusable

neglect on the part of the administrator that would justify
the intervention of the heir, and might warrant the court in
tolerating, for the benefit of the estate, the suit in the name
of the heir.  Even then, however, the heir could only main-
tain possession for and instead of the administrator, and the
property thus recovered would be subject to the payment of
the debts of the estate.  But it may be further answered that,
in this case, there was no administrator, he having been by
order of the probate court discharged; but, upon the discovery
of this additional property belonging to the estate, as the
estate is still heavily indebted, could not and would not the
creditors procure further administration, and, the rights of
the creditors supervening those of the heir, would they not be
paramount?

Our probate law, as well as that of California, much re-
sembles the probate law of Texas.  The decisions of the
supreme court of Texas, therefore, defining the rights of heirs,
the rights of creditors, and of administrators, under her pro-
bate law, should have much weight in determining questions
like the one before us.  In *Giddings* v. *Steele,* 28 Tex. 748,
91 Am. Dec. 336, in which plaintiff sued not as the grantee of
the heir, but as the sole heir of William H. Steele, and claimed
to be the absolute owner of the land sued for, the court says:
"When there are creditors, or an administrator of the estate,
the heirs should not be permitted to sue for and recover prop-
erty of the estate in their own right, and hold it against the
administrator and the creditors, and thus effect a partition of
the estate, in whole or part, without satisfying the debts
against the estate.  It would seem to be a safe rule not to
permit the heirs to recover property by suit in their own
right, unless they make it appear that the administration
has been closed, or that the condition of the estate is equiva-
lent to that, by showing there is no administrator ap-
pointed or acting, and that there are no debts against the
estate."  It should be noted that this decision goes to the
extent that, as a condition precedent to the right of the
heir to maintain the action, there must not only be no ad-
ministrator, but there must be no debts unpaid.  The legiti-
mate evidence afforded by the probate record of the admin-
istration in this case showed the utter insolvency of J. M.

Bryan's estate to the large amount of over $11,000. Now, to claim that it is not insolvent, but that a large and valuable estate in realty has descended to the heir, through the channel of this self-same administration of said estate,—and certainly it will not be claimed that it could descend through any other channel,—presents to us a glaring solecism. Nor is the solecism lessened by the pretension that the widow and heir of the intestate in this case could and has legitimately and rightfully conveyed the title to this valuable estate, belonging to an insolvent estate, to the plaintiff. The estate could not be solvent and insolvent, the debts could not be paid and unpaid, at the same time. Probate courts move in spheres of equity. The great purpose of administration is, primarily, to pay off the debts of the intestate, that the heirs may come to their inheritance. Within these equitable spheres, the heirs have no right to the inheritance till the debts are paid. Technically, it is true, the estate descends to and vests in the heir; but, within these equitable probate spheres, it is everywhere and always subject, as a condition precedent, to the payment of the intestate's debts. How is it, then, that the heir can claim the estate till the debts are paid? We cannot yield assent, therefore, to the conclusion that the plaintiff made out a *prima facie* case.

At this stage of the proceedings the court, on motion of the defendant and against plaintiff's consent, nonsuited him; and this brings us to a consideration of the next important question in this case, viz., have the district courts of this territory power to grant involuntary nonsuits, where it shall be judicially determined that there is no evidence to warrant the verdict of a jury? This question is an important one, for the reason that its determination settles an important and economic question of practice in this territory till overruled. If the court had this power, we do not doubt it was rightly exercised in this case. The majority of the court, in their opinion herein, deny the power, on the ground that we ought to follow the rule on this subject as established by the United States supreme court; and the supreme court of New Mexico, in *Herreras* v. *Chaves*, 2 N. Mex. 86, hold to a similar view, even going further; for Mr. Justice Bristol, in delivering the opinion of the court, says: "But, whatever may be the pre-

ponderance of authority among the different states in favor
of recognizing and exercising this judicial authority, we are
constrained to regard the decisions of the United States su-
preme court as conclusive, if they cover the case before us;
the reason being that an appeal or writ of error lies from
the final decrees or judgments of the supreme court of a terri-
tory directly to the United States supreme court." In other
words, this authority holds that the decisions of the United
States supreme court in all cases are binding and conclusive
upon this court. We deny the proposition, and contend that
in no cases, except where federal questions are involved, are
those decisions necessarily binding or conclusive upon us.
True, in certain contingencies, appeals or writs of error do lie
from the territorial supreme courts to the United States su-
preme court; but does it follow that that court would hold that
the rulings and decisions of territorial supreme courts, upon
the laws and statutes of the territories and rules of local prac-
tice, should conform invariably to the rulings and decisions
of that court? On the contrary, will not the supreme court
of the United States adopt the interpretation put upon the
territorial laws, and conform to the rules of practice estab-
lished, by the supreme courts of the territories? Will it con-
travene these rules of practice, affecting only territorial
questions and litigation, simply because they do not conform to
its rules of practice, affecting federal questions and litigation?
Does it not in all matters, except where federal questions are
involved, extend the same considerations for, and conformity
to, the decisions of the supreme courts of the territories, in-
volving territorial litigation, as to those of the state supreme
courts, involving state litigation, except, forsooth, it be where
the organic act or some act of Congress has placed a limitation
upon the territorial judiciary? Does it not defer and conform
to the rulings of the state supreme courts upon state questions
and statutes? Has it ever undertaken to indicate to the states
or the territories a code or system of practice? Therefore will
the federal supreme court, in passing upon our decisions,
adopt the rule of practice established by the supreme court
of Arizona, upon the question of granting involuntary non-
suits, or will it inject its own rule on that subject into our
system? It seems to us this question can admit of but one

answer. In the case of *Sweeney* v. *Lomme,* 22 Wall. 213, (a case that went up from the territory of Montana,) Mr. Justice Miller, speaking for the United States supreme court, said: "Without expressing any opinion of our own on the question, we hold that, as it is one which arises under their own Code of Practice, we should, in this conflict of authority, adopt the ruling of the supreme court of Montana in the consideration of it." Now, it is true, by the sixth section of the judiciary act of 1789, the supreme court of the United States can make rules of practice for the district and circuit courts of the United States, which ordinarily would be conclusive upon them; but it is now no longer an open question, that territorial, district, or supreme courts are not United States courts, in the sense of the constitution. "They are not constitutional courts, in which the judicial power conferred by the constitution on the general government can be deposited." The jurisdiction which territorial courts exercise is no part of the vast judicial power of the general government, except so far as the organic act of the territory, and the other acts of Congress relating thereto, may have extended this jurisdictional power. These courts, then, do not come within the purview of the provisions of the judiciary act of 1789, for at that time there were no territories. The supreme and district courts of this territory are simply its legislative courts, created by virtue of its organic act, which came from that power vested in Congress to make all needful rules and regulations for the territories of the United States. The policy of the government is, and has ever been, to allow the largest latitude of local self-government to the territories compatible with the federal constitution and the laws of Congress, and to clothe, by the organic act, each territorial government with the essential habiliments of sovereignty; this being in line with the genius of our government. Under this benign policy, each territory is allowed to build up a system of practice and judicature peculiar to its conditions. And we apprehend that the decisions of the supreme courts of the territories within proper spheres, interpreting the laws of the local governments, and establishing rules of legal practice therein, will receive from the United States supreme court similar recognition to those of state supreme courts upon state laws and practice. True, in the one

there might not be jurisdiction; in the other, there would be; but this difference in judicial attitude would certainly super-induce no distinction in the line and policy of federal decision. Ours is a dual system of government, compassing national and local sovereignty; and, while the territories do not possess some elements of sovereignty which belong to the states, yet, to the extent of legislating upon all rightful subjects of legislation, and administering their own laws, they are sovereign; and while, even within this sphere, Congress might invade their sovereignty and annul their laws, it has never yet done so. Their supreme and district courts possess chancery and common-law jurisdiction, and to these tribunals the United States supreme court will look for the construction of territorial laws, guided by and conforming to the systems of practice established in the territories, respectively. Therefore the federal supreme court will not undertake to say how the judicial power of these territorial tribunals shall be exercised, when the exercise of that power does not impinge upon federal questions.

Now, does the granting of an involuntary nonsuit involve a federal question? Certainly not. It involves simply a question of local practice, and, maybe, the interpretation of a territorial statute. Will it be contended that the United States supreme court holds, or has ever held, that its rules of practice are obligatory upon the territorial courts? Has it ever undertaken to establish a system of judicial practice for the territories at variance with the systems established by their supreme courts? Of course the decisions of that lofty tribunal upon all federal questions—questions affecting the laws or constitution of the United States—are conclusive and supreme; but will it go, has it ever gone, any further? Therefore we do not think the supreme court of New Mexico in the Chaves case was concluded by the decision of the United States supreme court in *Elmore* v. *Grymes,* (see 1 Pet. 469,) because no federal question was involved. The question in the Chaves case was the identical question involved here,—that of granting an involuntary nonsuit; and it is well settled that this is purely a question of law, involving a judicial determination of the question as to whether there is any evidence to warrant the verdict of a jury; and, as it is equally well

settled that this does not invade the constitutional right of trial by jury, there could not, therefore, have been any federal question involved. At most, the decision in the Grymes case and similar decisions have only established the rule of practice to be against allowing involuntary nonsuits in federal courts, and we have already seen that ours are not federal courts. Besides, federal courts are not common-law courts. They derive their vast powers from the constitution and the ·statutes and the boundless domain of equity. Involuntary nonsuit had its origin in the common law. This is possibly the reason that in federal courts involuntary nonsuits do not obtain. There is nothing in federal jurisprudence nor federal legislation requiring the subserviency of territorial courts. In a great opinion, (*Franklin* v. *Kelley,* 2 Neb. 84,) delivered by Chief Justice Mason of the supreme court of Nebraska in 1872, combating the idea that state courts were bound by federal courts except where federal questions were involved, this language is used: "In these days of federal absorption and state subserviency, this idea is likely to receive a too ready assent. . . . The peer of this court is the supreme court of the United States. Its decisions upon questions arising out of the federal constitution and federal statutes are binding on us; but so, on the other hand, our decisions upon questions arising out of our state constitution and our state statutes are binding upon it. At the same time, upon that wide domain which is presented by general jurisprudence, the federal supreme court and the state supreme court hold an equal and divided jurisdiction. Our opinions are not binding upon it, nor its opinions upon us." We will not forget, however, that the decisions of the federal supreme court upon all questions are of the most exalted authority, and should and will be received with the greatest respect, and even reverence, and given the most careful consideration. Our conclusion, however, is that, in passing upon the question as to the power of the court below to grant an involuntary nonsuit, this court is not concluded by the decisions of the federal supreme court upon similar questions; it being merely a question of practice in the respective jurisdictions. Indeed, we are constrained to hold that, as the great bulk of well-considered American decisions and the positive prepon-

derance of reason favor the doctrine, this power was inherent in the court. The decisions of the state supreme courts in favor of this practice are simply innumerable, and it is not necessary to refer to them. No good reason has ever been given why this power should not, in proper cases, be exercised by the courts, while there are many and unanswerable reasons why it should be. In *Elmore* v. *Grymes,* the dissenting opinion of Mr. Justice Johnson, fortified as it was by the weight of authority, both in this country and in England, has never been answered. Indeed, is it not unanswerable? Why should not this power belong to the court? What good reason is there for incurring the additional expenses of a new trial, when the same purpose would be subserved by a nonsuit? Is it not a distinction without a difference to say that a defendant may demur to the evidence, and have his demurrer sustained, and yet he cannot move to nonsuit the plaintiff? In other words, that the court has power to sustain a demurrer to the evidence, but cannot grant a nonsuit *in invitum?* That the judge cannot tell the plaintiff, although he may tell the jury, that, in law, he (plaintiff) cannot recover? To us, this is the difference between tweedle-dum and tweedle-dee. One of the glories of the jury system is that there is wisdom in the council of many, but the practical knowledge of this council should be enlightened and guided by law. Why have the jury deliberate in the solution of a question of fact, and bring in a verdict, if, by reason of the law, its action is to be a nullity? Why is it not in accordance with reason that the judge should determine this question of law beforehand? An eminent law writer and jurist has said, with reference to the province of the grand jury, that in many cases it is a judicial White Friars, "whose privilege of sanctuary is pernicious to the best interests of society"; and with equal pertinency these remarks might often be applied to the province of the trial jury, for under both "the number of new trials, of frivolous appeals, and the consequent delays of justice have become an absolute reproach to the law." In *Pratt* v. *Hull,* 13 Johns. 334, it seems to us the supreme court of New York has put this question beyond cavil. It says: "The answer to this abstract question cannot admit of a doubt. This must be a power vested in the court. It results necessarily from their

being made the judges of the law of the case, when no facts are in dispute. . . . It was a pure question of law whether, under a given state of facts, the plaintiff was in law entitled to recover; and, unless this was a question for the court, there is no meaning in what has been considered a salutary rule in our courts of justice, that to the questions of law the judges are to respond, and to questions of fact, the jury." This question is both interesting and important, not only to the courts of this territory, but to the bar and litigants. We are establishing a rule of practice,—one that on its affirmative side has the elements of economy in it. One of the demands of the hour is, how to economize in the administration of our laws; and, as reason and common sense strongly support this rule, we think it would be judicious to incorporate it into our system of practice. Hence we are of the opinion that the judgment of the district court should be affirmed.