## Richard Ferris v. Charles Frohman et al.

### Gen. No. 12,928.

1. COPYRIGHT LAW—*what extinguishes common law rights of authors in United States.* Where a public production of a play is given in England with the consent of the authors which together with other action taken by such authors operates to extinguish in England the common law rights of such authors, likewise has the effect of extinguishing the common law rights of such authors in such production with respect to the United States.

Bill for injunction. Appeal from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1906. Reversed and remanded with directions. Opinion filed February 1, 1907.

Statement by the Court. Counsel for appellant make in their brief the following statement of the facts disclosed by the record, and counsel for appellee state it is substantially correct:

"The record shows that in 1894 Charles Haddon Chambers and B. C. Stephenson, citizens and residents of London, England, created and invented an original play called 'The Fatal Card,' which was publicly performed at the Adelphi Theatre in London on September 6, 1894, by A. & S. Gatti, who were theatrical managers. The play was registered at Stationers' Hall in compliance with the copyright statutes of the Kingdom, on October 31, 1894, and re-registered on November 8, 1894. This performance was with the consent of the authors of the play. In the same year Charles Frohman, one of the complainants, made an

agreement with the authors for the right to produce
the play in the United States. This agreement was
dated June 13, 1894, and was for a term of five years.
This right expired, therefore, on June 13, 1899. On
March 25, 1895, the complainant Frohman acquired
all the interest of Stephenson in the play in and for the
United States. His right to maintain the present bill,
if he has any such right, rests upon this contract
made with Stephenson over six months after the per-
formance at the Adelphi Theatre with the authors'
consent and about six months after the copyrighting of
the play in Great Britain. The play was never copy-
righted in the United States. It is conceded for the
purpose of this argument that George E. Macfarlane
adapted this play of Chambers and Stephenson; called
it by the identical name, 'The Fatal Card,' and that
the defendant Richard Ferris caused this adaptation to
be copyrighted in pursuance of the laws of the United
States on the 16th day of August, 1900, and there-
after caused the same to be produced and performed
in various theatres of the United States, and was en-
gaged in the business of so producing said play and
causing it to be produced until enjoined therefrom in
the present suit. The play was changed in many ways,
but the substantial plot and *dramatis personae* were
sufficiently alike to justify the master's conclusions.
It was an adaptation, but not a copy. It is also con-
ceded that this was done without the consent of the
authors of the play.''

Charles Frohman, at the time he made the contract
(June 13, 1894) for the American rights of this play,
and at the time (March 25, 1895) when he purchased
Stephenson's one-third interest in the play, was a
citizen and resident of the United States.

Complainants filed this bill January 18, 1901, setting
up the facts and praying for an accounting, for an
injunction and general relief.

Appellant defendant answered, and a replication
was filed by complainants:

The case was referred to a master to take proofs and
report the same with his conclusions. The master re-

ported that the complainants had failed to establish an exclusive right to produce the play in the United States, and that the prayer of the bill should be denied, and the bill dismissed.

Objection and exceptions were duly filed. On the hearing before the chancellor a decree was entered granting the relief prayed by the bill.

ALDRICH & McAULEY and L. E. CHIPMAN, for appellant.

HOGAN & HOGAN, for appellees; THOMAS S. HOGAN and E. C. MAPLEDORAM, of counsel.

MR. JUSTICE SMITH delivered the opinion of the court.

There was some conflict in the evidence upon the question of identity of the two plays as copyrighted respectively by the parties to the controversy, or those in privity with them, in England and in this country, but the concessions made by appellant, set forth in the statement preceding this opinion, leaves the case before us with no question of fact involved.

The bill is founded on the common law rights of the authors. The question, then, upon which the case hinges is: Did the public performance of the play by the authors in London, England, on September 6, 1894, and the registration thereof at Stationers' Hall in compliance with the copyright statutes of the United Kingdom, on October 31, 1894, and the re-registration thereof on November 8, 1894, have the legal effect of an abandonment or dedication to the public so as to extinguish the common law rights of the authors in the United States?

Property in an unpublished work is, without doubt, personal, and it is subject to the same general rules which govern personal property. As personal property it is governed by the *lex domicilii*. Drone on Copyright, page 104; Scrutton on Copyright, page 127.

"The property of an author in his intellectual production is absolute until he voluntarily parts with all or some of his rights. There is no principle of law by which he can be compelled to publish it or to permit others to enjoy it. He has a right to exclude all persons from its enjoyment; and, when he chooses to do so, any use of the property without his consent is a violation of his right." Drone on Copyright, page 102.

It is competent, however, for the legislative authority to put limitations upon the duration and use of this character of property, and to provide the conditions under which an intellectual production may be published to the world without becoming public property, and when, if published it is thereby dedicated to the public.

Under this authority Parliament, in 1833, passed an Act to amend the Laws relating to Dramatic Literary Property, 3 and 4 Will. IV. c. 15, which, after reciting that by an act passed in the fifty-fourth year of his late majesty George the Third, "the author of any book or books composed and not printed or published, or which should thereafter be composed and printed or published," should have a copyright for twenty-eight years, and that it is desirable to extend the provisions of the said act, and provides that:

"From and after the passing of this act the author of any tragedy, comedy, play, opera, farce, or any other dramatic piece or entertainment, composed and not printed and published by the author thereof or his assignee or which hereafter shall be composed and not printed or published by the author thereof or his assignee or the assignee of such author, shall have as his own property the sole liberty of representing or causing to be represented, at any place or places of dramatic entertainment whatsoever, in any part of the United Kingdom of Great Britain and Ireland, in the Isle of Man, Jersey and Guernsey, or in any part of the British dominions, any such productions aforesaid, not printed and published by the author

thereof or his assignee, and shall be deemed and taken to be the proprietor thereof'' * * * ''for the period of twenty-eight years.''

This Act was again amended by the Act of 5 and 6 Vict., ch. 45, section 20, passed in July, 1842, as follows:

''Be it therefore enacted, that the provisions of the said act of his late Majesty, and of this act, shall apply to musical compositions; and that the sole liberty of representing or performing, or causing or permitting to be represented or performed, any dramatic piece or musical composition, shall endure and be the property of the author thereof, and his assigns, for the term of this act provided for the duration of copyright in books; and the provisions hereinbefore enacted in respect of the property of such copyright, and of registering the same, shall apply to the liberty of representing or peforming any dramatic piece or musical composition, as if the same were herein expressly re-enacted and applied thereto, save and except that the first public representation or performance of any dramatic piece or musical composition shall be deemed equivalent, in the construction of this act, to the first publication of any book.''

Prior to these enactments the public performance of a dramatic piece did not have the effect of publication unless the author's manuscript was printed or published. Under this Act of 1842, however, it is clear that the first public representation or performance of any dramatic piece is equivalent to the first publication of a book.

The record shows and the master found that the play in question, called ''The Fatal Card,'' was publicly performed at the Adelphi Theatre in London, England, on September 6, 1894, with the consent of Charles Haddon Chambers and B. C. Stephenson, the authors; and the play was registered at Stationers' Hall in compliance with the copyright statutes of the United Kingdom of Great Britain on October 31, 1894, and re-registered on November 8, 1894.

After this first publication and registration of the

play all the rights of the owners were derived from the statutes of 5 & 6 Vict., sec. 20, and 3 & 4 Will. IV, providing for copyright. MacGilivray, Law of Copyright, p. 36; Drone on Copyright, p. 576. The common law right ceased, and the statutory right attached on certain conditions named in the statute and formed the only protection to which the owners were entitled throughout the Kingdom of Great Britain. Boucicault v. Delafield, 1 Hen. & M. 597; Boucicault v. Chatterton, 5 Ch. Div. 267.

The solicitors for complainants appellees, however, contend that the publication of the play in England did not affect the common law rights of the authors in the play in America, and that those rights remained undisturbed thereby; and that notwithstanding the extinguishment of their common law rights in England they can assert them here. Counsel admit in argument that "when the publication of a play (meaning its dedication to the public) is by the act of the party the owner divests himself absolutely of all exclusive rights in the play. Such a publication is a dedication the world over, because the party by his act so declares it." But they claim that the publication of this play in London was not such a publication; it was only a dedication by act of statute law, and therefore an invasion of the owner's common law property rights to which his assent is not asked or needed.

To this contention we cannot assent. When the authors published the play at the Adelphi Theatre, London, it was with their consent, as the record shows. That act was done and assented to under the law there in force, which expressly provided that it should be the legal equivalent "to the first publication of any book."

In Boucicault v. Chatterton, supra, the court had under consideration the effect of a representation of a dramatic work in the United States before it was copyrighted in England, upon the right to a copyright

under the statutes above referred to, and the court was necessarily required to construe the statutes and determine their effect upon this character of property. The court held that the public acting of the play in New York was a publication which deprived the author of exclusive right in England. This broad construction of the English statute adopted by the English courts had not been given to the statutes at the time (1870) when Crowe v. Aiken, 2 Biss. 208, was decided. As the master suggests in his report, the learned chancellor did not have in mind when deciding Crowe v. Aiken, the effect given to the English statute in the Chatterton case.

In the case of Palmer v. DeWitt, 47 N. Y. 532, also relied upon by counsel for appellees, the author made an assignment of an exclusive right in a play in the United States to the complainant on February 1, 1868. The play was subsequently represented in a theatre in London on February 15, 1868. It was held that after the transfer of the exclusive interest in the play in the United States, a representation of the play in London would have no effect upon the rights of the assignee. That portion of the opinion of the court which relates to the real issue before the court, affords no light upon the case before us, the question there having but a remote relation (if it can be said to have any) to the question here presented.

We do not find in the cases cited by counsel for appellees authority for holding that after the performance of the play "The Fatal Card" in London, with the consent of the owners and the registration at Stationers' Hall, the owners retained their common law rights in the United States. We think the performance in London and the registration at Stationers' Hall operated to destroy the common law rights of literary property in the authors, and that thereafter the only protection to which the authors or owners were entitled was that given by the statutes of England. Drone on Copyright, p. 577.

The statutes of England relating to copyright have no extra-territorial force or operation. No copyright rights in the United States were reserved by the au-thors. Such rights were lost by failing to procure a copyright simultaneously under the laws of the United States. Boucicault v. Wood, Fed. Cas. No. 1693; The Mikado Case, 25 Fed. Rep. 183; Fraser v. Yack, 116 Fed. Rep. 285; Am. & Eng. Ency. of Law (2nd ed.), 528.

It follows, we think, that the English authors of this play had no property rights in the United States which they could confer upon appellee, Frohman, on June 13, 1894, or at any time subsequent to the publication in London. We are, therefore, of the opinion that appellees, complainants below, failed to establish an exclusive right to produce the play in the United States, and that the prayer of complainants' bill should be denied.

The decree of the Superior Court is accordingly reversed, and the cause remanded for proceedings in accordance with the views herein expressed.

*Reversed and remanded with directions.*