## FERRIS *v.* FROHMAN.

ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 44. Submitted November 7, 1911.—Decided February 19, 1912.

Although complainant may assert his own common-law copyright to his play, if he alleges that defendant has obtained a copyright for the play sought to be enjoined, and the defendant stands upon the copyright and is enjoined, a Federal right is set up and denied, and this court has jurisdiction to review the judgment, under § 709, Rev. Stat.

Under the law as it existed in 1894, after a play had been performed in England, the rights of the owner to protection against the unauthorized production in England is only that given by the statutes; but the deprivation of common-law rights by force of the statutes was limited by territorial bounds within which the statute was operative.

Public representation in this, or in another, country of a dramatic composition, not printed and published, does not deprive the owner of his common-law right save by operation of statute.

At common law the public performance of a play is not an abandonment to public use.

The purpose and effect of the copyright law is not to render fruits of piracy secure; and a copyright does not protect one producing a play which is substantially a copy of an unprinted and unpublished play, the common-law property right whereof is in another.

238 Illinois, 430, affirmed.

THE facts, which involve the right of authors to unpublished dramatic compositions and productions on the stage, are stated in the opinion.

*Mr. Charles H. Aldrich,* with whom *Mr. Charles R. Aldrich, Mr. Charles G. McRoberts* and *Mr. L. E. Chipman* were on the brief, for plaintiff in error:

· Plaintiff in error properly claimed below that the play which he was presenting and against which the injunction was sought, was protected by copyright under § 4952, Rev. Stat., and that the assertion of common-law rights in a drama which had been copyrighted in England by its authors who were citizens of Great Britain was in conflict with the copyright arrangements between Great Britain and this country and the act of March 3, 1891.

The final decision of the Supreme Court of Illinois was against these claimed rights and a Federal question is therefore involved. *Erie R. R. Co.* v. *Purdy,* 185 U. S. 148, 153; *C., B. & Q. Ry. Co.* v. *Illinois,* 200 U. S. 561, 580, 581; *Murdock* v. *Memphis,* 20 Wall. 635; *Pickering* v. *Lomax,* 145 U. S. 310; *U. P. R. R. Co.* v. *Colburn,* 164 U. S. 383; *Green Bay &c. Canal Co.* v. *Patten Paper Co.,* 172 U. S. 58, 68; *Dale Tile Company* v. *Hyatt,* 125 U. S. 46; *Atherton* v. *Fowler,* 91 U. S. 143.

There could have been no decision in favor of the plaintiff below that did not in effect deny the right claimed under the copyright laws of the United States by the defendant below. In such case there is a Federal question whether mentioned in the opinion of the court below or not. *Erie R. R. Co.* v. *Purdy,* 185 U. S. 148, 153; *C., B. & Q. Ry.*

*Co.* v. *Illinois*, 200 U. S. 561, 580, 581; *Murray* v. *Chatterton*, 96 U. S. 432, 441, 442.

The statute 5 & 6 Vict., c. 45, § 20, makes public performance of a dramatic work with the author's or owner's consent equivalent to the first publication of a book.

And in England it is held that performance in the United States with the owner's consent terminates the author's playright in England and makes the performing right *publici juris*. *Boucicault* v. *Chatterton*, 5 L. R. Ch. Div. 267; *Boucicault* v. *Delafield*, 1 H. & M. 597; 7 & 8 Vict., c. 12, § 19; Drone on Copyright, 583; *Jefferys* v. *Boosey*, 4 H. L. Cas. 815, 847, 852, 856; *Chappell* v. *Purday*, 14 M. & W. 303; *Boosey* v. *Purday*, 4 Ex. Rep. 145.

The performing right or playright had no existence at common law separate and apart from the manuscript of the author, but dates its origin from 3 & 4 Wm. IV, c. 15, and in this country from the act of Congress, August 18, 1856, 11 Stat. 138. *Boucicault* v. *Chatterton*, L. R. 5 Ch. Div. 269; *Wall* v. *Taylor*, 9 L. R. Q. B. D. 727, 730; *Donaldson* v. *Beckett*, 4 Burr. 2408; *Jefferys* v. *Boosey*, 4 H. L. Cas. 815, 920.

The English act was passed to give the right of performance and was brought about by the decision in *Murray* v. *Elliston*, 5 B. & Ald. 657; *Chappell* v. *Boosey*, 21 Ch. Div. 232, 241.

The public performance of a drama is in all respects analogous to the right to multiply copies of a book. It is not a common-law right distinct from the manuscript. Cases *supra* and *Wheaton* v. *Peters*, 8 Pet. 590; *Banks* v. *Manchester*, 129 U. S. 123, 151; *White-Smith Music Co.* v. *Apollo Co.*, 209 U. S. 1, 15.

The statutes and decisions cited make public performance of the play a "publication" equivalent to the publication of a book and the word should have the same meaning in the law of literary property in this country if that equality of right with respect to such property as between

the citizens of the United States and those of the Kingdom of Great Britain intended by the international copyright arrangement and the acts passed to carry it into effect is not to be defeated.

There can be but one publication and it makes no difference where this is made if with the consent of the author cr proprietor. *The Mikado Case,* 25 Fed. Rep. 183; Drone on Copyright, pp. 293, 295 and 577; *Boucicault* v. *Wood,* Fed. Cases, No. 1683; *Pierce* v. *Bushnell Mfg. Co.* v. *Werckmeister,* 72 Fed. Rep. 54; 7 Amer. & Eng. Ency. of Law, 2d ed., p. 528, sub. Copyright; 25 Cyc. 1495, and cases cited.

The contention of defendant in error is rendered presumptively unsound by the history of the struggle for international copyright arrangements. 2 Sen. Doc., 24th Cong., 2d Session, Doc. 179, and Messages of President therein; Report Royal Commissioners on Copyright; § 4971, Rev. Stat.; Act March 3, 1891, 26 Stat. 1106–1110.

It was not the intention of Congress to give to foreign citizens and composers advantages in this country which, according to the international copyright convention, were to be denied to citizens of this country abroad. *White-Smith Music Co.* v. *Apollo Co.,* 209 U. S. 1, 15.

No copyright can be obtained in this country after a publication in this or any foreign country. Rev. Stat., § 4956.

Publication puts an end to common-law rights and all rights of the author or proprietor, unless he at the same time takes steps to initiate and secure statutory rights. Drone on Copyright, pp. 100–104; MacGillivray on Copyright, 36–38; *Mercantile Agency* v. *Jewelers' Pub. Co.,* 155 N. Y. 241; *Mifflin* v. *White Co.,* 190 U. S. 260; *Mifflin* v. *Dutton,* 190 U. S. 265.

The two rights do not coexist in the same composition. Drone on Copyright, pp. 100–104; *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339, 346; *Fraser* v. *Yack,* 116 Fed. Rep.

285; *Mercantile Agency* v. *Jewelers' Pub. Co.*, 155 N. Y. 241; *Tompkins* v. *Halleck*, 133 Massachusetts, 32, 36.

The claim that this proposition should be limited by adding the words "in the same country," or equivalent words, as contended by counsel for defendant in error, is without foundation.

Copyright in a book or drama is the exclusive right of the owner to multiply and dispose of copies; this is where the drama is treated as a book. Playright is the exclusive right of public performance of the dramatic or musical composition. There is no reason why one should cease upon publication, or when devoted to unrestricted public use, and not the other.

*Mr. Levy Mayer* for defendants in error:

This court has no jurisdiction of the present writ of error. *Appleby* v. *Buffalo*, 221 U. S. 524; *Waters-Pierce Oil Co.* v. *Texas*, 212 U. S. 86; *Harding* v. *Illinois*, 196 U. S. 78; *Howard* v. *Fleming*, 191 U. S. 126; *Home for Incurables* v. *New York*, 187 U. S. 155; *De Lamars* v. *Nesbitt*, 177 U. S. 523; *Sayward* v. *Denney*, 158 U. S. 180.

The public performance in England of a manuscript play which under the British statutes is made a publication and deprives the author of his common-law right of exclusive representation, does not deprive the author of such common-law right in this country where public performance is not deemed a publication. *Crowe* v. *Aiken*, 2 Biss. 208; *S. C.*, Fed. Cas. No. 3441; *Palmer* v. *De Witt*, 2 Sweeny, 530; *S. C.*, 40 How. Pr. 293; aff'd 47 N. Y. 532; *Tompkins* v. *Halleck*, 133 Massachusetts, 32; Drone on Copyright, 118–121, 554, 574; Wandell, Law of the Theater, 479; 25 Cyc. 1497.

At common law and before the passage of copyright statutes an author had an exclusive property right in his manuscript. Cases *supra*, and see Drone on Copyright, 102.

The public performance of a manuscript drama is not in this country a publication, but the author still retains his common-law right to its exclusive representation. Drone on Copyright Law, 119; cases *supra* and *Boucicault* v. *Hart,* 13 Blatchf. 47; *S. C.,* Fed. Cas. No. 1692; *Aronson* v. *Fleckenstein,* 28 Fed. Rep. 75; 25 Cyc. 1497, and cases cited.

A different rule prevails in England by statute. Stat. 3 & 4 Wm. IV, c. 15; Stat. 5 & 6 Vict., c. 45, § 20; *Boucicault* v. *Delafield,* 1 Hem. & M. 597; *Boucicault* v. *Chatterton,* 5 Ch. Div. 267; Drone on Copyright, pp. 574, 605, 656; MacGillivray on Copyright, 126; Scrutton on Copyright, 3d ed., 72.

The provisions of the English statutes in regard to registration of dramatic compositions are permissive only. Drone on Copyright, pp. 280, 603; MacGillivray on Copyright, 47, 133; Scrutton on Copyright, 3d ed., 88; 8 Halsbury's Laws of England, 179; *Russell* v. *Smith,* 12 Q. B. [Ad. & El. (N. S.)], 217; *Clark* v. *Bishop,* 27 L. T. (N. S.) 908.

The *lex domicilii* cannot fix the status of literary property where the author seeks to enforce rights in respect thereto in a foreign country. 1 Morgan, Law of Literature, 479; Drone on Copyright, 581; Story's Conflict of Laws, § 550; cases *supra,* and *Baglin* v. *Cusenier Company,* 221 U. S. 580; *Minor* v. *Cardwell,* 37 Missouri, 350.

MR. JUSTICE HUGHES delivered the opinion of the court.

This is a writ of error to the Supreme Court of Illinois.

The suit was brought by Charles Frohman, Charles Haddon Chambers, and Stephano Gatti (defendants in error), to restrain the production of what was alleged to be a piratical copy of a play known as "The Fatal Card." Its authors were Charles Haddon Chambers and B. C. Stephenson, British subjects resident in London, who com-

posed it there in 1894. The firm of A. & S. Gatti, theatrical managers of London, of which the complainant Gatti is the surviving partner, became interested with the authors and on September 6, 1894, the play was first performed in London. It was registered under the British Statutes on October 31, 1894, and again on November 8, 1894. Charles Frohman, of New York, by agreement of June 13, 1894, obtained the right of production in this country for five years. On March 25, 1895, Frohman acquired all the interest of Stephenson in the play in and for the United States, and it was extensively represented under his supervision. It was not copyrighted here.

George E. McFarlane made an adaptation of this play, called it by the same name, and transferred it to the plaintiff in error, Richard Ferris, of Illinois, who copyrighted it in August, 1900, under the laws of the United States, and later caused it to be performed in various places in this country. The adapted play differed from the original in various details, but not in its essential features.

The Superior Court of Cook County found that the complainants were the sole owners of the original play; that it had never been published or otherwise dedicated to the public in the United States or elsewhere; and that the Ferris play was substantially identical with it. Ferris was directed to account, and was perpetually restrained from producing the adaptation which he had copyrighted. The Appellate Court for the First District reversed the decree (131 Ill. App. 307), but on appeal to the Supreme Court of Illinois this decision was reversed and the decree of the Superior Court was affirmed. 238 Illinois, 430.

The defendants in error contest the jurisdiction of this court upon the ground that the bill was based entirely upon a common-law right of property, and insist that the upholding of this right by the state court raises no Federal question. But the complainants sued, not simply to maintain their common-law right in the original play,

but by virtue of it to prevent the defendant from producing the adapted play which he had copyrighted under the laws of the United States. They challenged a right which the copyright, if sustainable, secured. R. S. 4952. It was necessary for them to make the challenge, for they could not succeed unless this right were denied. Ferris stood upon the copyright. That it had been obtained was alleged in the bill, was averred in the answer, and was found by the court. The fact that the court reached its conclusion in favor of the complainants, by a consideration, on common-law principles, of their property in the original play does not alter the effect of the decision. By the decree Ferris was permanently enjoined "from in any manner using, . . . selling, producing, or performing . . . the said defendant's copyrighted play hereinbefore referred to for any purpose." The decision thus denied to him a Federal right specially set up and claimed within the meaning of § 709 of the Revised Statutes of the United States. This court, therefore, has jurisdiction. *C., B. & Q. Ry. Co.* v. *Drainage Commissioners,* 200 U. S. 561, 580, 581; *McGuire* v. *Commonwealth,* 3 Wall. 382, 385; *Anderson* v. *Carkins,* 135 U. S. 483, 486; *Shively* v. *Bowlby,* 152 U. S. 1, 9; *Northern Pacific R. R. Co.* v. *Colburn,* 164 U. S. 383, 385, 386; *Green Bay &c. Canal Co.* v. *Patten Paper Co.,* 172 U. S. 58, 67, 68.

The substantial identity of the two plays was not disputed in the appellate courts of Illinois and must be deemed to be established. The contention was, and is, that after the public performance of the original play in London in 1894, the owners had no common-law right, but only the rights conferred by the British statutes; and that Frohman's interest (save the license which expired in 1899) was subsequently acquired. Hence, it is said, the play not being copyrighted in the United States was *publici juris* here and the adapter was entitled to use it as common material.

Performing right was not within the provisions of 8 Anne, c. 19, which gave to authors the sole liberty of printing their books. *Coleman* v. *Wathen*, 5 T. R. 245. The act of 1833, known as "Bulwer-Lytton's Act," conferred statutory playright in perpetuity throughout the British dominions, in the case of dramatic pieces not printed and published; and for a stated term, if printed and published. 3 & 4 Wm. IV, c. 15. By § 20 of the Copyright Act of 1842, 5 & 6 Vict., c. 45, it was provided that the sole liberty of representing any dramatic piece should be the property of the author and his assigns for the term therein specified for the duration of copyright in books. The section continued: "and the Provisions hereinbefore enacted in respect of the Property of such Copyright, and of registering the same, shall apply to the Liberty of representing or performing any Dramatic Piece or Musical Composition, as if the same were herein expressly reënacted and applied thereto, save and except that the first public Representation or Performance of any Dramatic Piece or Musical Composition shall be deemed equivalent, in the Construction of this Act, to the first Publication of any Book." Mr. Scrutton, in his work on copyright (4th ed., p. 77), states that it is "probable, though there is no express decision to that effect, that the court, following *Donaldson* v. *Beckett* (2 Bro. Cases in Parl. 129), would hold the common-law right destroyed by the statutory provisions after first performance in public." Compare MacGillivray on Copyright, pp. 122, 127, 128. And it may be assumed, in this case, that after the play had been performed the right of the owners to protection against its unauthorized production in England was only that given by the statutes.

Further, in the absence of a copyright convention, there is no playright in England in the case of a play, not printed and published, where the first public performance has taken place outside the British dominions. This

results from § 19 of the act of 7 & 8 Vict., c. 12, known as
the International Copyright Act, which provides: "Neither
the Author of any Book, nor the Author or Composer
of any Dramatic Piece or Musical Composition, . . .
which shall after the passing of this Act be first published
out of Her Majesty's Dominions, shall have any Copy-
right therein respectively, or any exclusive Right to the
public Representation or Performance thereof, otherwise
than such (if any) as he may become entitled to under
this Act." The provision applies to British subjects as
well as to foreigners, and the words "first published"
include the first performance of a play. In *Boucicault* v.
*Delafield* (1 H. & M. 597), the author of the play known
as "The Colleen Bawn" filed a bill to restrain a piratical
production. It appeared that the play had first been
represented in New York, and by reason of that fact—
there being no copyright convention with the United
States—it was held that, under the statute above quoted,
there was no playright in England. To the same effect is
*Boucicault* v. *Chatterton* (5 Ch. Div. 267), where the author
unsuccessfully sought to restrain an unauthorized per-
formance of "The Shaughraun," an unprinted play which
had first been represented here.

The British Parliament, in thus fixing the limits and
conditions of performing rights, was dealing with rights
to be exercised within British territory. It is argued that
the English authors in this case, by the law of their domi-
cile, were without common-law right and in its stead se-
cured the protection of the British statutes which cannot
avail them here. But the British statutes did not purport
to curtail any right of such authors with respect to the
representation of plays outside the British dominions.
They disclose no intention to destroy rights for which
they provided no substitute. There is no indication of a
purpose to incapacitate British citizens from holding their
intellectual productions secure from interference in other

jurisdictions according to the principles of the common law. Their right was not gone *simpliciter*, but only in a qualified sense for the purposes of the statutes, and there was no convention under which the authors' work became public property in the United States. See *Saxlehner* v. *Eisner*, 179 U. S. 19, 36; *Saxlehner* v. *Wagner*, 216 U. S. 375, 381. When § 20 of the act of 5 & 6 Vict., c. 45, provided that the first public performance of a play should be deemed equivalent, in the construction of that act, to the first publication of a book, it simply defined its meaning with respect to the rights which the statutes conferred. The deprivation of the common-law right, by force of the statute, was plainly limited by the territorial bounds within which the operation of the statute was confined.

The present case is not one in which the owner of a play has printed and published it and thus, having lost his rights at common law, must depend upon statutory copyright in this country. The play in question has not been printed and published. It is not open to dispute that the authors of "The Fatal Card" had a common-law right of property in the play until it was publicly performed. *Donaldson* v. *Beckett*, 2 Bro. Cases in Parl. 129; *Prince Albert* v. *Strange*, 1 MacN. & G. 25; *Jefferys* v. *Boosey*, 4 H. L. C. 815, 962, 978. And they were entitled to protection against its unauthorized use here as well as in England. *Wheaton* v. *Peters*, 8 Pet. 591, 657; *Paige* v. *Banks*, 13 Wall. 608, 614; *Bartlett* v. *Crittenden*, 5 McLean, 32; *Crowe* v. *Aiken*, 2 Biss. 208; *Palmer* v. *De Witt*, 2 Sweeny, 530; 47 N. Y. 532.

What effect, then, had the performance of the play in England upon the rights of the owners with respect to its use in the United States? There was no statute here by virtue of which the common-law right was lost through the performance of the unpublished play. The act of August 18, 1856 (11 Stat. 138, c. 169), related only to dramatic compositions for which copyright had been

obtained in this country; its object was to secure to the author of a copyrighted play the sole right to its performance after it had been printed. *Boucicault* v. *Fox,* 5 Blatchf. 87, 97, 98. The same is true of the provisions of the Copyright Act of July 8, 1870 (16 Stat. 198, 212, 214; R. S. 4952, 4966), and of those of the act of March 3, 1891 (26 Stat. 1106, 1107), which were in force when the transactions in question occurred and this suit was brought. The fact that the act of March 3, 1891, was applicable to citizens of foreign countries, permitting to our citizens the benefit of copyright on substantially the same basis as its own citizens (§ 13), and that proclamation to this effect was made by the President with respect to Great Britain (27 Stat. 981), did not make the British statutes operative within the United States. Nor did that fact add to the provisions of the act of Congress so as to make the latter destructive of the common-law rights of English subjects in relation to the representation of plays in this country, which were not copyrighted under that act and which remained unpublished. These rights, like those of our own citizens in similar case, the act of 1891 did not disturb.

The public representation of a dramatic composition, not printed and published, does not deprive the owner of his common-law right, save by operation of statute. At common law, the public performance of the play is not an abandonment of it to the public use. *Macklin* v. *Richardson,* Ambler, 694; *Morris* v. *Kelly,* 1 Jac. & W. 481; *Boucicault* v. *Fox,* 5 Blatchf. 87, 97; *Crowe* v. *Aiken,* 2 Biss. 208; *Palmer* v. *De Witt,* 2 Sweeny, 530, 47 N. Y. 532; *Tompkins* v. *Halleck,* 133 Massachusetts, 32. Story states the rule as follows: "So, where a dramatic performance has been allowed by the author to be acted at a theatre, no person has a right to pirate such performance, and to publish copies of it surreptitiously; or to act it at another theatre without the consent of the author

or proprietor; for his permission to act it at a public
theatre does not amount to an abandonment of his title
to it, or to a dedication of it to the public at large."
2 Story, Eq. Jur., § 950. It has been said that the owner
of a play cannot complain if the piece is reproduced from
memory. *Keene* v. *Wheatley*, 9 Am. Law Reg. 33; *Keene* v.
*Kimball*, 16 Gray, 545. But the distinction is without
sound basis and has been repudiated. *Tompkins* v. *Hal-*
*leck, supra.*

And, as the British statutes did not affect the common-
law right of representation in this country, it is not ma-
terial that the first performance of the play in question
took place in England. In *Crowe* v. *Aiken* (1870), *supra*,
the play "Mary Warner" had been composed by a British
subject. It was transferred to the plaintiff with the
exclusive right to its representation on the stage in the
United States for five years from June 1, 1869. It had
not been printed with the consent either of the author or
of the plaintiff. It was first publicly performed in London
in June, 1869, and afterwards was represented here. The
court (Drummond, J.), held that the plaintiff by virtue
of his common-law right was entitled to an injunction
restraining an unauthorized production. In *Palmer* v.
*De Witt* (1872), *supra*, the suit was brought to restrain
the defendant from printing an unpublished drama called
"Play," composed by a British citizen resident in London.
The plaintiff on February 1, 1868, had purchased the ex-
clusive right of printing and performing the play in the
United States. On February 15, 1868, it was first per-
formed in London. It was held that the common-law
right had not been destroyed by the public representation
and the plaintiff had judgment. In the case last cited,
and apparently in that of *Crowe* v. *Aiken*, the transfer to
the plaintiff antedated the public performance, but neither
decision was rested on that distinction. In *Tompkins*
v. *Halleck* (1882), *supra*, an unpublished play called

"The World" had been written in England where, after being presented, it was assigned by the author to a purchaser in New York. It was acted in that city and then transferred to the plaintiffs with the exclusive right of representation in the New England States. The plaintiffs' common-law right was sustained and an unauthorized performance was enjoined.

Our conclusion is that the complainants were the owners of the original play and exclusively entitled to produce it. Their common-law right with respect to its representation in this country had not been lost. This being so, the play of the plaintiff in error, which was substantially identical with that of the complainants, was simply a piratical composition. It was not the purpose or effect of the copyright law to render secure the fruits of piracy, and the plaintiff in error is not entitled to the protection of the statute. In other words, the claim of Federal right upon which he relies is without merit.

*Judgment affirmed.*