## KETCHAM v. NEW YORK WORLD'S FAIR 1939, Inc.

### Civ. No. 581.

District Court, E. D. New York.

July 11, 1940.

658

Morgan, Finnegan & Durham, of New York City (George B. Finnegan, Jr., of New York City, of counsel), for plaintiff.

Lord, Day & Lord, of New York City (Woodson D. Scott, of New York City, of counsel), for defendant.

MOSCOWITZ, District Judge.

Howard Ketcham, the plaintiff, a resident of Connecticut, brings this action against the New York World's Fair 1939, Incorporated, a corporation organized under the laws of the State of New York, for an injunction and an accounting.

The plaintiff, a color engineer, furnished the defendant with a color chart, Exhibit 6, and the accompanying written description and directions. Exhibit 6 is a disclosure of a complete colored plan or map of the Fair together with numerous written suggestions of the application, function and manner of use of that color design.

Had the defendant made use of plaintiff's color chart, Exhibit 6, he would be entitled to recover as, undoubtedly, the plaintiff's disclosure constitutes substantial intellectual property. Palmer v. DeWitt, 47 N.Y. 532, 7 Am.Rep. 480. The cause of action having arisen in New York, the New York law applies. It is the law of New York, as claimed by the plaintiff, that an individual has a property right in his original unpublished intellectual productions. The Court in the case of Palmer v. DeWitt, decided:

"The rights of authors in respect to their unpublished works, have been so frequently and elaborately considered and carefully adjudicated by the courts of this country and of England, and are now so well understood and established that there is but little to do in passing upon the merits presented by the record before us, save to apply the rules clearly deducible from adjudged cases of conceded authority.

* * *

"The right is well defined and succinctly stated by the author of a recent work as follows: 'Every new and innocent product of mental labor which has been embodied in writing, or some other material form, being the exclusive property of its author, the law securing it to him as such, and restraining every other person from infringing his right. Whether the ideas thus unpublished take the shape of written manuscripts of literary, dramatic or musical compositions, or whether they are the designs for works of ornament or utility planned by the mind of an artist, they are equally inviolable while they remain unpublished, and the author possesses an absolute right to publish them or not as he thinks fit (and if he does not desire to publish them), to hinder their publication either in whole or in part, by any one else.' Shortt on the Law of Literature, 48."

See Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12, 16 Am.St.Rep. 740. The doctrine in Palmer v. DeWitt, supra, and Tabor v. Hoffman, supra, has been generally followed by the Courts.

The Court in the case of Werckmeister v. American Lithographic Co., 2 Cir., 134 F. 321, 324, 68 L.R.A. 591, decided: "The author of a work of art has at common law a property therein until it is published with his consent. He may withhold or communicate it, and in communicating it he may impose such restrictions upon its use as he sees fit. Drone on Copyright, 103; Parton v. Prang, 3 Cliff. [537] 548, Fed. Cas. No. 10,784. The right to make copies before publication and the right of first publication are common-law rights. The right to multiply copies after publication to the exclusion of others is the creature of statute. Palmer v. DeWitt, 47 N.Y. 532-536, 7 Am.Rep. 480."

Judge Coxe very recently held infringement of common law copyright in part of the music of an unpublished song. Wilkie v. Santly Bros., D.C., 13 F.Supp. 136. An author is entitled to his original unpublished intellectual work. See Ferris v. Frohman, 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492; Booth v. Stutz Motor Car. Co. of America, 7 Cir., 56 F.2d 962; American Ornamental Bottle Corp. v. Orange-Crush, 4 Cir., 76 F.2d 969; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912;

A. O. Smith Corporation v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531; and Id., 6 Cir., 74 F.2d 934; Thompson v. Famous Players-Lasky Corporation, D.C., 3 F.2d 707; Healey v. R. H. Macy & Company, Inc., 251 App.Div. 440, 297 N.Y.S. 165.

The Court is in accord with the statement made by the plaintiff that it is the law that one who has worked out an embodiment of a design for a work of art or plans for a large building program possesses a property right in his original production.

The proof shows that there are fundamental differences between plaintiff's plan as shown in plaintiff's Exhibit 6 and the plan actually put in use by the defendant. The only similarity is the graduated tone of blue along Constitution Mall. The differences are fully pointed out in the following testimony of Mr. Ernest S. Peixotto, Consultant on Mural Paintings of the Fair, who testified:

"A. In my plan the idea was to keep the Theme Center white, and from it step the colors down in gradation toward the left, toward yellow, towards the center, towards red and toward the right towards blue, as clearly indicated by the chart, Defendant's Exhibit A. So when the full color was reached you had Rainbow Avenue as a prismatic chord that went through the three colors of the spectrum, yellow, red and blue. I see no relation between this color plan before me and the one which the Fair adopted. The strong colors come in immediately at the Theme Center, and no spectrum or rainbow is visible as in that.

"Also I would add that in the Fair's consideration of the color scheme so based properly upon esthetic grounds, it had no scientific reason, or socalled reason for existence, but was intended to bind together the buildings of different shapes into a certain unity and yet a variety of ensemble."

The color plan for the Fair was conceived by Mr. Peixotto and was carried out by Mr. Julian E. Garnsey, Color Consultant of the Fair, and the lighting was coordinated by Mr. Bassett Jones, Consultant on Lighting. Mr. Peixotto, Mr. Garnsey and Mr. Jones are the Color Committee of the Fair, appointed on January 29, 1937, and had complete charge of the color scheme of the Fair.

Plaintiff's idea upon which this suit is brought is contained in the descriptive matter shown in Exhibit 6. In this he discusses the advantages of a color scheme for the Fair. He states, among other things, the following:

"Today, color is a magic key to progress in a wide variety of activities. Through the scientific application of color, sensations of heat, cold, light, darkness, spaciousness, and physical well-being are induced.. actions, directions of movement, and rates of speed are suggested...locations, classifications, divisions of buildings are indicated...and interest, inquiry and sales of various products are stimulated.

"Today, the psychological effects of colors are being put to useful purposes. Subconscious reactions to colors are being directed to desired objectives by engineers familiar with their phenomena. How·timely, how attractive and how directly useful it would be to have psychologically correct, scientifically applied colors greet the expected fifty million visitors to New York's World's Fair of 1939!

"How easy it would be for visitors to find their way with all Recreational activities one certain hue—with Education, Arts, Religion, Industry, Sanitation, Transportation each in its own individual, distinctive hue! And with subdivisions of these activities tied-in with variations of the basic hue; as, for example, Arts in a certain hue of blue (purple-blue, green-blue or pure blue) with Machine Arts, Graphic Arts, Crafts, Photography, the Theatre, the Dance, Opera and Puppets in variations of that hue! The entire Fair a magnificent harmony of pleasing color!

"Pleasing color on the outsides of the buildings, and on the insides there would be colors to rest and refresh the visitors— colors to stimulate them to action—colors to attract and hold their interest in special displays—colors to guide them to rest rooms and comfort stations—colors to make them feel more liberal towards the amusements.

"An experienced Color Engineer, by the skillful application of such color schemes, would play upon the emotions of the crowds to the extent of tending to keep them in a cheerful frame of mind, making them almost oblivious to fatigue, adding to their appreciation of the displays, and making them more tolerant of the enforcement of Rules and Regulations.

"But, color reactions are not general. They are specific to a certain hue, value and chroma of a certain color. To have

any such values as stated, the exact hues, values and chromas must be determined and used. Properly selected colors, properly illuminated would be as effective by night as by day. And proper illumination includes intensity, character, position and color of light. It means more than merely the blazing of great candle-power. It means careful studies of interior areas, seasons of the year, objects to be illuminated and thorough knowledge of the light absorbing capacity of the objects. Correct color lighting can enhance the effectiveness of displays by night and give them more charm than by daylight.

"Since 87% of human impressions are registered through the eyes, how important and how wonderful to have the Fair harmoniously colored and properly illuminated and thus to get the greatest amount of favorable public reaction. It would be the first large-scale use of definitely known color values. It would offer untold opportunities for publicity.

"Color engineering is developed to such an exact science that a complete plan for 'An Exposition in Color' is practically ready for use. The colors that will have greatest public acceptance in 1939 need to be determined; but, machinery for determining this is already set up and in use at the present time to serve certain leading manufacturing and merchandising organizations and to assist them in anticipating seasonal color preferences among different spending groups throughout the nation."

The graduation of color in the plan actually used at the Fair starts at the Theme Center of almost pure white to the outer extremities of the Fair which are the greatest intensities of the three hues, yellow, red and blue.

In the plaintiff's plan there is more of a mosaic pattern which fits the shapes and sizes of buildings into a complete picture or plan which is well-balanced. The plaintiff's plan was to take all the arts and place them in the blue section of his mosaic, to take all the recreation buildings and place them in the red section, etc.

The differences between plaintiff's plans, Exhibits 6 and 16 (Exhibit 16 being a duplicate of Exhibit 6), and the plan followed by the defendant, are fully set forth in the testimony of Mr. Garnsey and Mr. Jones.

Mr. Garnsey testified, as follows:

"The Court: How far does the plan of the Fair follow the idea suggested in Plaintiff's Exhibit 6 and 16?

"The Witness: I am anxious to show your Honor. Our scheme definitely depends upon this Ball and Trylon, as pure white as we could get it. There was an argument. The buildings surrounding the Theme Plaza in the Fair scheme are slightly modified white, and that white color theme carries through all the buildings in the Fair in one place or another as relief. The colors on Rainbow Avenue, Constitution Mall, Avenue Pioneer, Avenue Patriots graduate from a very pale tone, purple hue to the strongest pigment intensity, all that I could get.

"Yellow on the avenue leading from the Theme Center to the perisphere. That hue comes in with pale tones and gradually deepens towards the strongest yellow I could get in the pigment. There is no color in that arrangement which is darker than the strongest pigment intensity. There are no shades or tones. Your Honor knows what I am talking about.

"The same thing is true on Constitution Mall where the red starts with a pale pink and finishes at the strongest intensity pigment, but goes no further below except in the case of the food building at the end of Constitution Mall.

"In the case of Avenue of Pioneers leading from Lincoln Square white is carried through the buildings all the way down to Lincoln Square but the color starts with pale blue and gradually deepens to the strongest color I could get in the darkest blue, and that is very important. There is no blue with any black in it in that entire arrangement of color. This Plaintiff's Exhibit 6 does not show white around the Theme Center at all. It seems to show strong color around the Theme Center, whereas in the World's Fair color scheme it does not appear until the end of the gradation which reaches out to Bowling Green, and located on Lincoln Square. In the color scheme at the Fair the same hue is used on both sides of the avenue, Pioneer and Avenue of Patriots.

"In Plaintiff's Exhibit 6 different hues are used on both sides of the street.

"In Plaintiff's Exhibit 6, the gradation on Constitution Mall starts with a minimum grade blue. It has six blue hues. The gradation starts with minimum gray-blue and goes to darker rich shade of blue at the far side of Rainbow Avenue. The values in the World's Fair are lighter than that and have no such gradation toward a shade.

"In the Federal area, Plaintiff's Exhibit 6 shows all the Federal gradation as being dark in value and possibly three steps of gradation.

"In the New York World's Fair the entire Federal group is light, just off white. There are seven gradations of value between the piers of the Federal Building and the Roumanian and British buildings at the Lagoon. These gradations are so subtle, not even professionals observe it. This has not been done before and is unique with me and is my idea. Rainbow Avenue in the World's Fair plan progresses from yellow through to orange to red to violet to blue. I find that the same yellow is repeated at the Bowling Green end and Lincoln Square end on Rainbow Avenue. Again on Rainbow Avenue there are different hues facing each other across the avenue. There are different hues that do not exist in the New York World's Fair Scheme.

"In Plaintiff's Exhibit 6 it shows a strong contrast between the Belgium and the French on one side of the Lagoon and the Roumanian and British buildings on the other side of the Lagoon, the French and Belgium buildings being blue, and the Roumanian buildings being red.

"In the New York World's Fair the hue family carries over but in the British and Roumanian building it is practically white, just graded somewhat. In strong contrast the approach was to keep this Lagoon as a unit.

"The Transportation area is not under discussion, I take it. This color scheme we evolved in the New York World's Fair, that vents on section one on the axis, the Court of Power and the Court of Communication; so that the color scheme in the Transportation area became the same as in section one, except the area was reverse, with the same gradations outward.

"I believe that is all I see in that.

"Q. What about Plaintiff's Exhibit 16, did you examine that? A. I will say the science of the New York World's Fair scheme was gradation from white to the strongest pigment intensity possible."

Mr. Jones testified as follows: "The Theme Center showing everything would be white, and from that point out the colors would be used, very much as you see them here graduated to blue to red down Constitution Mall; red in this direction and in the Transportation section, blue in this direction; gold in that direction. Both ends would be tied together by arrangement of color. There was always a change of names of streets in this plan. I remember seeing that the red was in the middle of this spectrum, and not where it belonged at one end of it. I said this was our spectrum and not God's. It was a design employed as a question of esthetics. It was on the basis of that sketch that the whole thing was worked out."

The conclusion is inescapable that, although the plaintiff's plan is excellent, the defendant did not follow it. It is unfortunate that the defendant did not see fit to discourage the plaintiff's efforts, as all the correspondence indicates that consideration was being given to plaintiff's plan. It would have been far better if the defendant had advised plaintiff that his services were not required, rather than encourage him in his efforts as is indicated in the correspondence. Frankness and candor on the part of defendant's representatives, rather than the desire to be too polite, would have saved the parties needless time and litigation.

Defendant is entitled to a decree but, under the circumstances, without costs.