## BROWN v. SELECT THEATRES COR-PORATION.

### Civil Action No. 2194.

District Court, D. Massachusetts.
June 30, 1944.

See also 3 F.R.D. 499.

Joseph N. Welch and Anthony Brayton, both of Boston, Mass. (Hale & Dorr, of Boston, Mass., of counsel), for plaintiff.

John M. Russell, James C. Gahan, Jr., and William F. Joy, all of Boston, Mass. (Ropes, Gray, Best, Coolidge & Rugg, of Boston, Mass., of counsel), for defendant.

WYZANSKI, District Judge.

### Findings of Fact

*Introductory*

1. This action is brought by a Massachusetts citizen against a New York corporation and involves more than $3,000. Complaint is made of various species of unfair competition. But the Court has segregated for separate trial one issue in the case which in the light of developments subsequent to the pre-trial order of March 6, 1944 can be fairly re-phrased as follows: Is the version of the dialogue of The Merry Widow which was received by the Libra-rian of Congress on May 24, 1907, now in the public domain?

2. That main issue turns on two subordinate questions: (A) on May 7, 1907, who was the owner of the literary property in the English dialogue of The Merry Widow which was embodied in the Edwardes manuscript; and (B) did the owner either transfer to Savage the literary property in that dialogue or give him the power to publish the dialogue so that it is now in the public domain?

A. *On May 7, 1907, who was the owner of the literary property in the English dialogue of The Merry Widow which was embodied in Edwardes' manuscript?*

3. In 1905 Victor Leon and Leo Stein wrote in German the dialogue and lyrics and Franz Lehar wrote the music of an operetta, "Die Lustige Witwe." Leon, Stein and Lehar assigned all their rights to that operetta to Felix Block Erben.

4. George Edwardes, a prominent London theatrical producer, entered into a contract with Erben on February 27, 1906. Under that contract Erben sold to Edwardes the sole rights of production in Great Britain, Ireland, the United States and Canada of "Die Lustige Witwe" in the English language; and Edwardes agreed to produce the operetta in three acts and not to make any more alterations or additions than were necessary to insure the success of the operetta on the English-speaking stage.

5. At an unknown date in 1906 Edwardes entered into a contract with Henry W. Savage, formerly an experienced real estate operator in Boston and then a well-known New York theatrical producer. Savage enjoyed the highest reputation for good character and business ability. The terms of that contract were probably written on the back of an envelope and have not been preserved. Exhibit 71 is at best a subsequent confirmation of that contract.

6. Thereafter, on May 1, 1907, Edwardes wrote a letter to Edward Morton offering him the opportunity to make an adaptation in English of "Die Lustige Witwe"; and on May 2, 1907, Morton accepted [Ex. 60 (1)]. Those letters have not been preserved.

7. "In accordance with" that basic contract, Edwardes by a letter to Morton dated May 22, 1907, offered to pay to Morton stipulated fees for certain performances of the adaptation, on the understanding that "all performing rights are to be my [Edwardes']

sole property." Morton accepted by letter dated May 23, 1907.

8. Morton had as associates in his work of adaptation Capt. Basil Hood and, so far as the lyrics are concerned, Arthur R. Ropes. Edwardes by a letter to Hood dated June 20, 1907, offered, in addition to what he paid Morton, to pay Hood for his adaptation stipulated fees for certain performances. The same day Hood accepted by letter. Edwardes apparently made a contract, now missing, with Ropes under which Ropes agreed to participate in the English adaptation in consideration of a payment of stipulated fees for performances. Then Edwardes in a letter now missing offered a modification of the fees of Ropes and of others. As part of a general scheme of reduction of fees, Ropes accepted this offer by a letter dated November 20, 1907.

9. May 7, 1907, five days after the basic contract for the English adaptation was executed, but before the execution of the subsidiary contract of May 23, 1907, with Morton, or the subsidiary contract of June 20, 1907, with Hood, or presumably the first subsidiary contract with Ropes, Edwardes delivered to Savage the completed English adaptation of the dialogue of "The Merry Widow."

10. Since the foregoing facts are admittedly equivocal and since Edwardes, Savage, Morton, Hood, Ropes and the Fromme brothers are dead, it becomes necessary for the Court to rely on interpretation and inference to reach its conclusion as to the ownership of the dialogue. It has seemed to me a reasonable inference from all the facts that when Morton and Hood wrote the English dialogue and Ropes (sometimes known as Ross) wrote the English lyrics of "The Merry Widow" at the request of Edwardes, they and he intended that the title and property to the completed English dialogue should belong to Edwardes and that he should exploit it. In reaching this conclusion I have given particular weight to the underlying facts that Edwardes had initiated the project by procuring from Erben the right to produce an English version of "Die Lustige Witwe"; that Edwardes had contracted with Erben that there should be no substantial changes in the text; that Edwardes had made a contract with Savage with respect to the English version before Edwardes made contracts with Morton, Hood or Ropes; and that neither Edwardes, nor Savage, nor Morton, nor Hood, nor Ropes ever stated that Morton, Hood or

Ropes had any literary property in the dialogue of "The Merry Widow." I have also borne in mind that the agreements between Edwardes, Morton, Hood and Ropes were made in England in 1907. At that time section 18 of the Copyright Act, 1842 (5 & 6 Vict. c. 45) provided that: "When any * * * person shall * * * have projected * * * any book whatsoever, and * * * shall employ any persons to compose the same * * * and such work * * * shall hereafter be composed under such employment, on the terms that the copyright therein shall belong to such * * * projector * * * and paid for by such * * * projector, * * * the copyright in every such * * * portion so composed and paid for * * * shall be the property of such * * * projector." And the English courts, construing that statute, had ruled that where a person employs and pays another to write a book for him, the author prima facie is held to assign his interest in the literary property even though the parties made no reference to the assignment of the literary property or the privilege of taking out a statutory copyright, Lawrence & Bullen, Ltd. v. Afalo [1904] A.C. 17, 23; Sweet v. Benning, 16 C.B. 459. In reaching my conclusion that Edwardes acquired the literary property, I have not overlooked the fact that the subsidiary agreements with Morton, Hood and Ropes all provided payment on a fee basis for performance rights, and that such form of payment ordinarily might indicate that the authors were not making sales of their property, but giving licenses for its use. However, these considerations seem less important to me because the basic adaptation contract between Edwardes and Morton is missing; the subsidiary contracts were made after the adaptation was complete and after Edwardes had given Savage a copy; and although "The Merry Widow" has been exploited by Edwardes and those with whom he has dealt not only by representations on the stage but by motion pictures and perhaps in other ways such as the sale of printed copies of the dialogue, the representatives of Morton and Hood have never sought any different or other rate of royalties than the limited fees stipulated for theatrical performances (Ex. 60, par. 5). I, therefore, find as a fact that on May 7, 1907, Edwardes was the owner and proprietor of the literary property of the dialogue of "The Merry Widow" which he delivered to Savage on that day.

B. *Did the owner either transfer to Savage either the literary property in that dialogue or give him the power to publish the dialogue so that it is now in the public domain?*

11. When Edwardes on May 7, 1907, transferred to Savage the manuscript of "The Merry Widow" he did not intend to and did not transfer to him either the legal or the equitable title to the literary property in the operetta. To be sure we are without direct knowledge of the terms of the contract of April 3, 1906, pursuant to which the transfer was made, for that contract is lost. However, other circumstances make it obvious that the parties thought that Edwardes retained legal and equitable title and gave Savage principally an exclusive license to perform the operetta in the United States and Canada. That this was the attitude of the parties is shown by their correspondence in 1907 and their supplemental contract of January 6, 1908 [Ex. 71, 72, 73]. It is also shown by the facts that one month after the transfer, June 8, 1907, Edwardes produced the operetta on the English stage; and two months after the transfer, July 4, 1907, Edwardes registered the operetta in the Register Book of the Stationer's Company pursuant to the permissive provisions of the English Copyright Act of 1842, 5 & 6 Vict. c. 45, which apparently do not require registration prior to performance. Russell v. Smith, 12 Q.B. 217, Drone, Copyright p. 280.

12. Edwardes, however, intended to and did transfer to Savage an exclusive license for the American performing rights which would be effective, durable and virtually impervious to litigation.

13. At the time Edwardes made the transfer of the manuscript to Savage, the English rule was that if a play was produced in the United States before it was produced in England or before the play was copyrighted as a book, the English performing rights were open to the public. See the authorities collected in Ferris v. Frohman, 223 U.S. 424, 432, 433, 32 S.Ct. 263, 56 L.Ed. 492. At that time the American rule was uncertain. It was not until 1912 in the case of Ferris v. Frohman, supra, that the Supreme Court of the United States authoritatively laid down the American rule that if a play was produced in England before it was produced in the United States or before the play was copyrighted, the American performing rights belonged to the owner of the literary property in the play. Until that decision a prudent, experienced man would have feared that a first performance in England would destroy American performance rights, unless the play had been copyrighted in the United States before the English performance.

14. Edwardes and Savage as experienced theaterical producers must have been familiar with this danger, which was notorious in the theatrical world. To guard against the danger and to protect Savage in his exclusive license, which was to the advantage of all parties, it would be natural for Edwardes to authorize Savage to make application for an American copyright and to make deposits in the Library of Congress of whatever was necessary in connection with that application. At any rate, Savage moved promptly to secure that copyright. He made application in the United States on May 23, 1907, hardly two weeks after he had the manuscript and almost three months before the first American performance [Stipulation par. 32]. This haste is best explained by the desire of both Edwardes and Savage that the application for an American copyright should precede the first English performance of "The Merry Widow" on June 8, 1907 [Stipulation par. 30], and should preserve Savage's exclusive American performing rights from what they feared would be destruction. From the foregoing, I find as ultimate facts that Edwardes authorized Savage to make application to and deposit of copies with the American Librarian of Congress and Register of Copyrights and that in accordance with such authority Savage made such application and deposit.

15. So far as it is a question of fact, I find that Savage's deposit of Exhibit 1A with the Library of Congress was a publication of the contents thereof, was authorized by Edwardes, and effectively destroyed the literary property which Edwardes had at common law in that version of "The Merry Widow."

16. After Savage secured the copyright he as plaintiff brought several suits against alleged infringers. In at least two of these suits he referred to himself as the owner of the copyright (Ex. 68, 69). In numerous controversies which did not reach the courts Savage also claimed to be the owner of a valid copyright on "The Merry Widow." In bringing these suits and making these claims, Savage was acting to protect both his interest as exclusive American licensee and Edwardes' interest as owner. In at

least some of these suits and claims Savage represented that he had made a deposit of "The Merry Widow" in the Library of Congress for public inspection [Cf. Ex. 68]. From time to time Savage reported to Edwardes and Edwardes heard from his American representative the general nature of the suits Savage was bringing and the claims he was making. Edwardes contributed to the costs of Savage's litigation and impliedly authorized Savage to take the steps essential to its successful prosecution, impliedly including the representation that the lawful owner of the literary property of "The Merry Widow" had authorized the deposit of copies of the operetta in the Library of Congress.

17. During the twenty-eight year life of the purported copyright Savage acted in reliance upon it. He and Edwardes made substantial profits, running into the hundreds of thousands of dollars. Some of these profits resulted from presentations directly under the auspices of Savage. Other profits came from performances which were conducted by persons who paid Savage royalties on his representation that he had both an American copyright and an exclusive license from Edwardes. It was not until after the expiration of the twenty-eight year period that any representative of Savage or Edwardes claimed that the statutory copyright was invalid and that there was still in existence a common law literary property in "The Merry Widow."

18. I, therefore, find as an ultimate fact that Edwardes ratified the action taken by Savage in making a deposit of Exhibit 1A in the Library of Congress and thus publishing it to the world.

## Conclusions of Law

1. On May 7, 1907, George Edwardes of London was the owner of the literary property in the version of the operetta "The Merry Widow" which is embodied in Exhibit 1A.

2. On that date he gave to Henry W. Savage of New York the exclusive license to perform that version in the United States and Canada, and authorized him to make a deposit of copies of that version in the Library of Congress in connection with an application for copyright.

3. In acting upon that authority and in making a deposit on May 24, 1907, of that version in the Library of Congress, Henry W. Savage published that version and effectively dissipated all common law literary property in that version.

4. The version of "The Merry Widow" which was received by the Librarian of Congress on May 4, 1907, is now in the public domain.

5. Nothing herein shall be construed to indicate a conclusion of law upon the questions: (a) Whether Savage individually or as agent, trustee or representative of Edwardes secured a valid American statutory copyright by his applications to and deposits with the Librarian of Congress or the Register of Copyrights; (b) whether the dialogue upon which plaintiff's complaint is based is substantially identical with the dialogue in Exhibit 1A; and (c) whether plaintiff is entitled to prevail upon issues in the case other than the one specifically set forth in the first finding of fact. If the parties desire to proceed with respect to other issues in the case, they may apply to me for an assignment for trial on those other issues at some date during the next term of Court.

In the Library of Congress there is now open for public inspection a copy of the dialogue of "The Merry Widow." It has been there since May 24, 1907, and no one suggests that since May 1935 it has been covered by a statutory copyright. The narrow question presented to me for decision is whether the person who owned the literary property represented by that dialogue assented to its being put in the Library. If he did, then, it is agreed, under the law the dialogue has now become public property.

The men who knew the facts best are all dead. Much of what they knew they never wrote down. When they did write, they often used language loosely and without reference to precise legal conceptions. Some of the most important things they wrote have been lost by their successors. Though much is lost, enough survives to answer the question before the Court.

The story begins when Edwardes, an Englishman, learned about an Austrian operetta that was a great success on the Continent. As the law then stood he could have translated the dialogue into English and done what he wanted with it, all without so much as saying to the authors "by your leave." Instead, he got permission to have the dialogue translated but on the condition he left it pretty much unchanged. Then he hunted up three fellows who agreed to put the dialogue and lyrics into

English for him in consideration of Edwardes' paying them royalties for each theatrical performance. So far as appears they were plying a regular trade of making adaptations for theatrical producers in England at a time when the custom was that where an entrepreneur hired an author to write for him, the entrepreneur was expected to own the literary product unless the parties stipulated otherwise. These three never claimed that they had done this translation on their own or had any interest in the matter except to get the specified royalties. And they did not broaden their claims even when the operetta was a great success. I cannot see that there is any room to doubt that when the three finished their work and handed it over to Edwardes, it was his property.

Edwardes wanted to get the play produced in the United States. He talked the matter over with Savage. They were both men of unusual experience in the theatrical business and they both had excellent reputations. To the end of their days they were on the best of terms and in frequent correspondence. We know that in May 1907 Edwardes gave Savage the manuscript to take to the United States and expressly gave him the sole performing rights in this country. We cannot find any document or any living person to inform us whether Edwardes told Savage he could apply for a copyright in America and in that connection leave the copy of the manuscript with the American Library of Congress where all copyright matter is deposited. But we do know that Edwardes himself took steps in England to register the performing rights in Stationers Hall under the English copyright law. We know he himself never took any similar action in the United States. Savage, however, did make a corresponding application and deposit in the United States. And from time to time he relied upon that deposit to claim, in and out of court, that he had a statutory copyright. Sometimes the assertion of that claim cost him money for copyright counsel and for litigation. Edwardes paid a share of these bills. And Savage and Edwardes wrote letters and conferred from time to time about the progress of the American performances. It seems to me incontrovertible that at some stage of this development Edwardes knew that Savage was going to make or already had made the application for the American copyright and the deposit in connection therewith. Indeed, in the light of the

doubt that existed in 1907 as to what would be Savage's rights in America after a performance of the operetta in England, I should suppose that Edwardes probably encouraged Savage to get an American statutory copyright before there was any performance in England or America. In short, I am convinced that Edwardes desired his manuscript of the dialogue placed in the Library of Congress, and it is there now because of that desire.

Perhaps Edwardes made a mistake of law. It may be that a sagacious lawyer would have said to Edwardes: "If you want absolute protection, there are only two alternatives, either take out the American copyright yourself; or instruct Savage to stay away from the Library of Congress and rely on your common law rights as the owner of the library property." But I am convinced Edwardes never received or has never followed such advice. He chose to let Savage put the dialogue on public view at the Library of Congress. And his decision placed the dialogue in the public domain at least since May 1935, and perhaps even earlier, although that question I do not have to decide. Being public property, the 1907 version of the dialogue is not a basis upon which Savage's representatives can secure an injunction.